[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 2, 2012
JOHN LEY
CLERK

_____

No. 10-13667

_____

D.C. Docket No. 1:08-cr-00352-WCO-ECS-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WALTER SANDERS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 2, 2012)

Before HULL, MARCUS and BLACK, Circuit Judges.

PER CURIAM:

Following a jury trial, Walter Sanders, Jr., appeals his convictions for

conspiring to possess with intent to distribute five kilograms or more of cocaine in

violation of 21 U.S.C. §§ 841 and 846, and for aiding and abetting possession with intent to distribute five kilograms or more of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841. After review of the record and oral argument, we affirm.

## I. PROCEDURAL BACKGROUND

### A. Sanders's Arrest

In June 2006, Immigration and Customs Enforcement ("ICE"), a division of the U.S. Department of Homeland Security, began investigating Gracie Priscilla Medina for distributing cocaine on behalf of two drug cartels. Through a confidential informant, ICE learned that a commercial tractor–trailer carrying a concealed load of cocaine was bound for one of Medina's distribution centers in Fayetteville, Georgia.

On May 7, 2007, ICE alerted the Georgia State Patrol ("GSP") to look out for the tractor–trailer. An officer with the GSP stopped the tractor–trailer, which was driven by Defendant Sanders, for various traffic and equipment violations. The video camera in the GSP vehicle recorded what happened during the traffic stop, which led to Sanders's arrest. After obtaining Sanders's consent, GSP officers searched both the tractor and the trailer. They discovered 153 kilograms of cocaine hidden in a pallet of cabbages, which were rotting because the refrigeration unit in the trailer was inoperable. Sanders was arrested on state charges.

**B. Sanders's Indictment on Federal Charges**

In 2008, a federal grand jury indicted Sanders on the present drug charges. Specifically, the superseding indictment charges that (1) Sanders, Medina, and two others—Daniel Marillo, Jr., and Salvador Marillo—conspired to possess with intent to distribute five kilograms or more of cocaine and (2) Sanders and Salvador Marillo aided and abetted others to possess with intent to distribute five kilograms or more of cocaine.[1]

Daniel and Salvador Marillo pled guilty to the drug conspiracy charged in the indictment. Medina pled guilty to a conspiracy charged in a separate indictment. All three cooperated with the government. Sanders proceeded to trial.

**C. Motions to Suppress and Other Pretrial Matters**

Before Sanders's trial, the government submitted both a "Sentencing Information Establishing Prior Conviction for the Purpose of Increased Punishment" and a notice that the government intended to introduce Sanders's 1988 conviction for selling marijuana. Sanders moved in limine to exclude evidence of his 22-year-old marijuana conviction as too remote and dissimilar from the present offense. Sanders also moved to suppress (1) his statements

---

[1]The indictment also includes a forfeiture provision, which applies only to Medina and is not at issue in this appeal. Before this federal indictment, the state charges against Sanders were dismissed.

during the traffic stop and (2) the cocaine seized from his tractor–trailer.[2]

At a suppression hearing on the eve of trial, the district court heard testimony from Sanders and the GSP officer who stopped the tractor–trailer. The government played an hour-long video of the traffic stop shot from the GSP vehicle. The district court found that the video clearly showed that Sanders consented to the search of both the tractor and the trailer. The district court denied the motion to suppress (1) the cocaine seized during the traffic stop and (2) his statements during the traffic stop. As to his prior marijuana conviction, the district court denied Sanders's motion in limine without prejudice to renewal during trial.

## II. TRIAL EVIDENCE

At trial, several law-enforcement witnesses testified about both what occurred at the traffic stop and the background of the government's investigation. Sanders's co-conspirators testified about both the load of cocaine charged in the indictment and a previous load of 7,700 pounds of marijuana that Sanders transported from Texas to North Carolina.

### A. Federal Investigation of Medina

The government's first witness was Agent Andre Kenneybrew, a special

---

[2]Sanders's motion also sought to exclude statements at his re-arrest on federal charges, but there were no such statements.

4

agent with ICE.  Agent Kenneybrew testified that in 2006 he began investigating drug activity by Gracie Priscilla Medina.  Through confidential informants, Agent Kenneybrew learned that Medina worked for a drug-trafficking organization run by Dimas Gonzalez (the "Gonzalez organization") and that Medina was responsible for collecting money and acquiring warehouses in the Atlanta area. Medina was instructed to lease the warehouses and "make it appear as if it was a legitimate business.  The organization would then send drugs concealed in legitimate loads of merchandise from Mexico to Atlanta."

When a tractor–trailer was arriving in the Atlanta area, Medina was responsible for coordinating the delivery.  Medina kept a separate cellular phone only for calls from the drivers of the delivery trucks.  She was "instructed to answer the phone professionally with the business name and give the driver instructions on how to get to the warehouse and set up a time for delivery." Although electronic surveillance and wiretaps were used in the Medina investigation, Agent Kenneybrew was never able to intercept conversations between Medina and the truck drivers.  Medina used a separate phone to talk to the truck drivers and the agents were unable to intercept the phone numbers.

Medina dated a man named Roberto Garcia, who belonged to a separate drug-trafficking organization run by Daniel Marillo, Jr., and Salvador Marillo (the

"Marillo organization"). Garcia eventually went to jail, and Garcia asked Medina to collect money for the Marillos. Medina was thus involved in two separate drug-trafficking organizations.

On cross-examination, Agent Kenneybrew testified that, as with the Gonzalez organization, the truck drivers for the Marillo organization were unaware that they were transporting drugs and believed that they were transporting legitimate loads. Although ICE was monitoring phones of the Gonzalez organization, ICE was not monitoring the phones of the Marillo organization.

Medina pled guilty to money laundering and trafficking marijuana, agreed to cooperate with the government, and also testified at Sanders's trial. Medina's testimony largely corroborated Agent Kenneybrew's. As explained later, Medina testified that she had two phone conversations with Sanders but otherwise did not know who he was.

**B. The Day of the Traffic Stop**

In May 2007, Agent Kenneybrew learned from a confidential source that a tractor–trailer was scheduled to arrive at a warehouse in Fayetteville, Georgia. Agent Kenneybrew contacted local police, who surveilled the warehouse beginning on May 7, 2007. Around noon, the local police informed Agent Kenneybrew that the tractor–trailer had arrived at the warehouse. Before Agent

Kenneybrew arrived on the scene, the local police called back and said that the tractor–trailer was leaving the warehouse without unloading anything.

One of the police officers surveilling the warehouse testified that the tractor–trailer was at the warehouse for no more than ten or fifteen minutes. The surveillance officer watched Sanders exit the tractor and Salvador Marillo exit his vehicle, and "[f]rom their hand gestures and body language [the officer] could tell that [Marillo] was trying to show [Sanders] how to negotiate his truck to back it up to the loading bay." A confidential source told Agent Kenneybrew that Sanders had refused to unload because he "did not like the location of the warehouse and wasn't comfortable unloading there."

During her testimony, Medina confirmed that, on May 7, 2007, she received a call from the truck driver asking for directions, and she gave the truck driver directions to the Fayetteville warehouse. Medina testified that she did not answer this phone call by identifying herself—she simply answered the phone and gave the driver directions to the warehouse. Later that day, Medina received another call from the truck driver, who stated that he did not want to unload at the warehouse because "he was uncomfortable," the location was "too narrow" to make a delivery, and he was upset that no one was there when he arrived. Medina had never received any similar complaints about the warehouse, and she told the

7

truck driver to talk to Marillo.  Salvador Marillo subsequently told Medina that the delivery would occur at another location.

In any event, the local police followed Sanders's tractor–trailer—which was following a red Volkswagen belonging to Salvador Marillo—to a nearby truck stop.  At the truck stop, Sanders exited the tractor and joined Salvador Marillo in the red Volkswagen, and they drove away.  That afternoon, Agent Kenneybrew contacted GSP and asked them to prepare a "whisper stop," in which ICE tells a local law enforcement agency that a vehicle contains drugs or other contraband but asks the local agency to develop its own probable cause for the stop to avoid compromising the federal investigation.  Around 8:00 p.m., the red Volkswagen returned to the truck stop, and Sanders returned to the tractor–trailer and followed the red Volkswagen out of the parking lot.  Agent Kenneybrew notified GSP, which subsequently stopped the tractor–trailer for traffic and equipment violations.

## C. The Traffic Stop and Seizure of Cocaine

The government also called Officer James Lamar Thompson, the GSP officer who stopped Sanders's tractor–trailer on May 7, 2007.  Although ICE notified him to look out for the vehicle, Officer Thompson stopped Sanders's tractor–trailer because he saw Sanders illegally cross three or four lanes of traffic

8

and noticed several equipment violations on the tractor–trailer. When Officer Thompson activated the blue lights to notify Sanders to stop the tractor–trailer, a dash-mounted camera began recording video of the events in front of the police vehicle. A microphone attached to Officer Thompson's uniform made an audio recording of the traffic stop.

The government played for the jury the hour-long video of the traffic stop while Officer Thompson narrated the events shown on the video. During the traffic stop, Sanders verbally consented to a search of both the tractor and the trailer, and he also signed two consent-to-search forms. Officer Thompson wrote Sanders citations for the traffic violation and various equipment violations while another officer, Dallas VanScoten, searched the trailer for narcotics.

After the video played, Officer Thompson authenticated several documents provided by Sanders during the traffic stop. Sanders provided (1) a commercial driver's license, (2) several registration cards showing that the tractor was registered to Kelvin Snead but reporting different license numbers, (3) a certificate of insurance, (4) a "cab card" for the tractor, (5) an inspection report dated January 12, 2007, and (6) a bill of lading, which indicated that Sanders's load of cabbages was scheduled for delivery at 5:00 a.m. the next morning in Raleigh, North Carolina. Officer Thompson testified that the registration cards raised a red flag

because Sanders presented two registration cards for the same vehicle. Officer Thompson obtained the second consent-to-search form so that the consent form showed either of the two possible registration numbers.

Additionally, the bill of lading concerned Officer Thompson because Sanders personally signed the bill of lading, the phone number for the shipper contained too many digits (11 digits instead of 10), and the loading date was May 4, 2007, in Edinburg, Texas. Officer Thompson testified that this was odd because (1) he stopped Sanders three days later on May 7, 2007, (2) Edinburg, Texas, was only 18 to 20 hours away, and (3) Sanders was carrying perishable cabbages and knew that the trailer's refrigeration unit was broken. A line on the bill of lading, titled "Special Instructions to Trucker," stated, "Drivers must maint. temperature at 36 F at all times." Officer Thompson testified that a legitimate truck driver would be more concerned with the integrity of the load because he would have to deliver the load before being paid.

Sanders also provided Officer Thompson with two receipts for repair work performed on the tractor–trailer. The first receipt, dated April 25, 2007, showed work done to other parts of the tractor and trailer but no work on the refrigeration unit. The second receipt, dated May 6, 2007, which was the day before the stop, showed that a fan belt was replaced but showed no work performed on the

10

refrigeration unit.

The government then called Officer Dallas VanScoten, another GSP officer. Officer VanScoten testified that Sanders's trailer did not appear professionally loaded because many of the boxes of cabbages were tilted or crushed. Sanders told Officer VanScoten that he had stayed in a motel, which was unusual because truck drivers typically sleep in their tractors to save money. After Sanders consented, Officer VanScoten searched the trailer by crawling from the back to the front on top of the rows of pallets full of rotten cabbages. Officer VanScoten could search only the top row of pallets and failed to find any drugs. Officer VanScoten then exited the trailer and used a trained narcotics-detection dog, who alerted several times to the odor of narcotics coming from the trailer.

Around 9:30 p.m., the GSP officers moved the tractor–trailer to a nearby parking lot to search the trailer. Agent Kenneybrew participated in unloading the trailer, which contained pallets of rotting cabbages. The government showed several photographs of the trailer and the cargo as it was being unloaded. In one of the pallets in the second row from the front (i.e., the tractor side) of the trailer, the agents discovered 153 kilograms of cocaine under a pile of rotting cabbages. At the time, each kilogram of cocaine had a street value of approximately

$28,000.00.[3]

**D. Co-conspirator Reyes's Testimony About an Earlier Load of Marijuana**

The government also presented the testimony of co-conspirator Eric Adrian Reyes, who was currently serving a prison sentence after pleading guilty to conspiracy to distribute cocaine.[4]

At age twelve, Reyes met Eddie Snead, who got Reyes involved in selling crack cocaine. Before turning 21 years old, Reyes had three state drug convictions and served 35 months in prison. While in prison, Reyes met Manuel Sanchez, who had connections to drug traffickers in Texas.

About six months after Reyes was released from prison, Sanchez introduced Reyes to Mario Cavazos, another drug trafficker. Sanchez and Cavazos were looking for vehicles to transport drugs, and Reyes sold them two vehicles in exchange for drugs. Shortly afterward, Reyes re-entered the drug business and began working with Cavazos to import large amounts of marijuana and cocaine from Texas to North Carolina.

---

[3]Sanders was arrested on state charges because ICE was not ready to indict all the co-conspirators in the federal investigation. Because the federal investigation remained ongoing when the state charges had to be resolved, Agent Kenneybrew instructed the state officials to release Sanders and drop the state charges to allow ICE to include the charges in a forthcoming federal indictment.

[4]Reyes was charged in North Carolina, pled guilty to conspiracy to distribute five kilograms or more of cocaine, and agreed to cooperate with the government.

Reyes was responsible for coordinating deliveries of narcotics, but he also had his own list of customers to whom he sold. One customer was Kelvin Snead, who amassed a drug debt of more than $100,000.00 and was Eddie Snead's cousin. Reyes knew that Kelvin Snead had a hauling business and that Cavazos was looking for a tractor–trailer. Kelvin Snead agreed to provide the tractor if Reyes purchased a refrigerated trailer. Reyes purchased the trailer in Kelvin Snead's name for approximately $7,500.00 cash. The refrigeration unit was working when he purchased the trailer. Reyes testified that the "sole purpose" of purchasing the trailer was to traffic narcotics from Texas to North Carolina.

According to Reyes, the tractor–trailer would be driven to Texas, where someone would arrange for a load of produce—called a cover load—in which to hide the narcotics. The drugs would be placed near the front of the trailer, and the rest of the trailer would be filled with produce. Although Reyes had the truck and the trailer, Kelvin Snead was responsible for hiring a driver, and his main driver was Sanders.[5]

In March 2007, Reyes, Cavazos, Kelvin Snead, and Sanders participated in the first trip using the newly purchased trailer. Reyes, Cavazos, and Kelvin Snead

---

[5] On cross-examination, Reyes admitted that Kelvin Snead also ran a legitimate business hauling gravel and that Sanders had driven legitimate loads for Kelvin Snead in the past.

met to plan the trip, but Sanders was not present at the meeting. Sanders subsequently drove the tractor–trailer from North Carolina to Texas and waited for Reyes and Cavazos to prepare the load, and then Sanders drove the tractor–trailer to the loading dock in Texas. Only Reyes and Cavazos organized the load; Sanders waited at a truck stop until the load was ready. For this trip, 7,700 pounds of marijuana were loaded on the truck, hidden in a cover load of cabbages. Sanders did not help load the trailer.

For the return trip to North Carolina, Cavazos led a caravan in his own car, followed by Sanders in the tractor–trailer, followed by Reyes driving his own car. Reyes testified that they drove in this order to "take care of the load" and to watch for law enforcement. If the trailer had contained only cabbages, Reyes and Cavazos would not have traveled along with Sanders. At a checkpoint in Texas, Reyes was stopped by law enforcement, who searched his vehicle. Reyes was relieved to see that Sanders made it through the checkpoint undetected. Sanders then pulled over to wait for Reyes, and Reyes had to call Sanders to tell him to go ahead without him. Before leaving Texas, the caravan stopped in Houston to unload 4,400 pounds of marijuana. Sanders was present while the marijuana was being unloaded but did not help unload the trailer.

The rest of the return trip was uneventful until Sanders was driving through

14

South Carolina and jack-knifed the tractor–trailer trying to avoid a car merging on to the interstate. Although law enforcement arrived on the scene, the driver of the car admitted that the accident was her fault, and law enforcement never searched the trailer. Sanders then drove to Kelvin Snead's shop in North Carolina, where the remaining 3,300 pounds of marijuana were unloaded. Sanders was on location when the marijuana was unloaded, but he did not help unload the trailer and remained inside the shop waiting to be paid.

Reyes testified that Sanders was originally supposed to be paid $50,000.00 for the marijuana trip, but Cavazos subsequently lowered Sanders's share to $30,000.00. After receiving an initial payment of approximately $9,000.00, Sanders demanded more money "because he found out there was narcotics" in the trailer. Reyes and Cavazos eventually gave Sanders 40 pounds of marijuana as additional payment for driving the tractor–trailer. In Reyes's experience, a truck driver would typically charge only $3,300.00 to drive a load of legal merchandise from North Carolina to Texas.

Several weeks later, Sanders drove the tractor–trailer back to Texas to pick up another load. Subsequently, Cavazos told Reyes that Sanders was caught in Georgia with 153 kilograms of cocaine. Reyes gave approximately $15,000.00 to Kelvin Snead to pay for a lawyer for Sanders. Reyes did not believe that Snead

ever used the money to hire a lawyer. As far as Reyes knew, Sanders had driven only the two loads—the first load of marijuana and the second load of cocaine for which he was on trial.

**E. Co-conspirator Richards's Testimony About the Cocaine Load**

The government also called co-conspirator Aaron Lamar Richards, who was currently serving a 132-month sentence for conspiracy to distribute cocaine. Richards used to deal cocaine with Eddie and Kelvin Snead. In 2007, Richards talked with the Sneads about an imminent load of cocaine that was going to be delivered from Texas. Richards and the Sneads were discussing the cocaine delivery when Sanders arrived. During the conversation, Sanders told Kelvin Snead that Sanders planned to change his route during this trip because he encountered too many cops on the route he took during his last trip.

Eddie Snead told Richards that Sanders was preparing to drive the tractor–trailer to Texas to pick up cocaine, and Richards agreed to buy 20 kilograms of cocaine from the load at $26,000.00 per kilogram. Richards never received the cocaine because Sanders was caught in Georgia and the cocaine was seized.

About a year later, Richards ran into Sanders at a restaurant in North Carolina, and Sanders stated that he had "beat the case down in Atlanta" and was

16

released. Richards suspected that Sanders's release meant that he was likely to be indicted by the federal government, but Richards did not reveal this suspicion. On cross-examination, Richards conceded that he knew that Sanders was going to face federal charges because Richards was recently arrested on federal drug charges and was released after agreeing to cooperate and collect evidence on his co-conspirators.

**F. Sanders's 1988 Marijuana Conviction**

After this testimony, the government renewed its Rule 404(b) request to admit Sanders's 1988 conviction for selling 1.4 grams of marijuana. The government argued that the conviction was probative of Sanders's intent to enter into the drug conspiracy. Sanders responded that the 22-year-old conviction was too remote to be probative and that a street-level sale of 1.4 grams of marijuana was too dissimilar to the international drug-trafficking conspiracy at issue to be probative of Sanders's intent.

The district court admitted the 1988 conviction but gave a cautionary instruction. The court instructed that the jury could consider the prior conviction only for the "very limited purpose" of determining whether Sanders had the state of mind or intent to commit the crimes charged in the indictment. The government rested.

17

Sanders moved for a judgment of acquittal. The district court denied the motion. Sanders presented no evidence.

**G. Jury Charge**

Because Sanders's appeal involves the jury charge, we also review what happened in that regard.

During closing arguments, defense counsel argued that Sanders was "just a truck driver" and that the government had failed to prove that Sanders knew he was hauling cocaine in the cabbages. Defense counsel asserted that the government "could have charged him with marijuana," and had "let one of his codefendants Ms. Medina plead guilty to marijuana," but the government was trying to "put this whole truckload of cocaine on Walter Sanders." Continuing with this theme, defense counsel argued that Sanders "obviously has a thing for marijuana" but "[t]hat doesn't mean he has a thing for cocaine." Defense counsel asserted that the government "charged a very particular conspiracy in this case," and specifically charged Sanders, Medina, and two others "with conspiracy to do this load of cocaine." Defense counsel questioned why the government was "trying to prove that Walter Sanders particularly knew it was cocaine in that trailer when they're letting other people plead to marijuana[?]"

In its jury instructions, the district court stated that, to convict Sanders of

18

the conspiracy charged in the indictment, the evidence must show beyond a reasonable doubt "that the object of the unlawful plan was to possess with intent to distribute more than five kilograms of cocaine, as charged." After the charge was given, the government objected that the charge should have stated merely that the object of the plan was to possess with intent to distribute a "controlled substance," rather than any specific drug. In reply, Sanders argued that the indictment specifically charged cocaine and that a "controlled substance" charge would undercut his defense. Sanders asked that the jury be given the option of convicting on the lesser-included offense of conspiracy to distribute marijuana.

Over Sanders's objection, the district court called the jury back in and instructed that Sanders did not have to know the nature of the particular drug but must know that he was possessing a controlled substance.[6] After deliberating for a

---

[6] The district court charged the jury:
Ladies and gentlemen, I'm going to try to clear up one thing that arose maybe in the closing arguments that I had not specifically and normally do not have specifically in my charge, but to clear it up.

  The defendant does not have to—I instruct you that when I was giving the elements of the three elements in each instance, I want you to understand that <u>the defendant does not have to know specifically the nature of the particular drug that he's possessing, but must know that it is a controlled substance</u>. Now, of course it has to be and you have to make those findings that it, in fact, was cocaine because that is charged what was possessed. And if you don't—and you must find the quantity, but it's not an element of the offense under the law. Under the law it is that he intended to possess a controlled substance, and then it happened to be whatever it might be in this case, alleged cocaine. It could be marijuana or whatever else is charged.

while, the jury asked whether the indictment terms "controlled substance" and "cocaine" were interchangeable.[7]  Over Sanders's objection, the district court advised the jury that the terms "are not totally interchangeable because 'controlled substance' is a broader term than 'cocaine'" and "includes many things," such as methamphetamine and other drugs.  The district court explained that the defendant "only has to have knowledge that it's a controlled substance" and "he does not have to have knowledge that it was actually cocaine that was being possessed."  The district court advised that the controlled substance may turn out to be cocaine, or marijuana, or methamphetamine, and the jury would also determine the amount of the drug involved for later sentencing calculations under the sentencing guidelines.

Sanders iterated his objection to the court's answer to the jury's question.  Less than ten minutes later, the jury returned a verdict of guilty on both counts.  On the special verdict form, the jury found that Sanders conspired to possess with intent to distribute five kilograms or more of cocaine and that he possessed with intent to distribute five kilograms or more of cocaine.

---

[7]The jury asked:
> In Counts 1 and 2, it uses the following: "controlled substance."  In the . . . amounts shown it was the following—"cocaine."  Is the word "cocaine" in the statement still interchangeable with the words "controlled substance"?

20

**H. Sentencing**

Sanders's presentence investigation report ("PSI") calculated a total offense level of 38[8] and a criminal history category of II, yielding a guidelines range of 262 to 327 months' imprisonment. Given Sanders's prior drug conviction, he faced a mandatory minimum sentence of 20 years' imprisonment. See 21 U.S.C. § 841(b)(1)(A) ("If any person commits such a violation [of § 841(a)] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment . . . .").

At sentencing, Sanders requested a two-level reduction for having a minor role in the offenses. The district court denied the reduction based on the trial evidence. The district court adopted the PSI's factual recitations and guidelines calculations. After considering the 18 U.S.C. § 3553(a) factors and Sanders's mitigation arguments, the district court sentenced Sanders to concurrent sentences of 250 months' imprisonment on his two convictions.

### III. DISCUSSION

On appeal, Sanders raises these six errors: (1) improper jury charge that

---

[8]The Drug Quantity Table in U.S.S.G. § 2D1.1(c)(1) provides for an offense level of 38 for a § 841(a) offense involving 150 kilograms or more of cocaine.

amended and broadened the indictment to include any controlled substance, (2) erroneous admission of his 1988 marijuana conviction, (3) insufficiency of the evidence, (4) wrongful denial of the motion to suppress evidence seized at the traffic stop, (5) wrongful denial of the motion to suppress his statements to the police, and (6) improper admission of co-conspirator Richards's hearsay testimony. After review of the record, and given Sanders's consent to the search of his tractor–trailer, we conclude that issues 3, 4, 5, and 6 wholly lack merit and do not warrant further discussion. However, issues 1 and 2 require further consideration.

## A. Jury Charge and the Indictment

It is well settled that a defendant enjoys a Fifth Amendment right to be tried on felony charges returned by a grand jury indictment and that only the grand jury may broaden the charges in the indictment once it has been returned. Stirone v. United States, 361 U.S. 212, 215–16, 80 S. Ct. 270, 272, 4 L.Ed.2d 252 (1960). The district court may not broaden the charges by constructive amendment. Id. "A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." United States

22

v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995) (quotation marks omitted).[9]

Sanders argues that the district court's jury instructions impermissibly broadened the charges in the indictment by instructing that Sanders did "not have to know specifically the nature of the particular drug that he's possessing, but must know that it is a controlled substance." For the reasons explained below, we conclude that this instruction is fully consistent with the statutory requirements and our precedent.

As background, we begin with the language of the relevant statutes. Section 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1) (emphasis added).[10] As is evident from the statutory language, a person violates § 841(a) merely by knowingly possessing with intent to distribute a controlled substance. The § 841(a) offense is complete once the person commits the proscribed act and knows that the substance is a "controlled substance."

[9] Both parties agree that the applicable standard of review of the particular issue here is de novo.

[10]Section 846 provides that any person "who attempts or conspires to commit any offense defined in this subchapter [including § 841(a)] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

"[B]ecause the specific amount and type of drugs are not elements of the [§ 841(a)(1)] offense, the government's failure to prove the amount or type charged in the indictment does not merit reversal." United States v. Baker, 432 F.3d 1189, 1233 (11th Cir. 2005); see also United States v. Mejia, 97 F.3d 1391, 1392–93 (11th Cir. 1996); United States v. Gomez, 905 F.2d 1513, 1514–15 (11th Cir. 1990).

At the outset, we also recognize that § 841(b) provides enhanced maximum sentences for persons convicted of violating §§ 841(a) or 846, depending on the quantity and type of drug involved. 21 U.S.C. § 841(b). Further, the enhanced statutory maximum penalties in § 841(b) cannot apply unless the jury determines the drug type and quantity involved in the overall drug conspiracy offense. See United States v. Sanchez, 269 F.3d 1250, 1270 (11th Cir. 2001) (en banc) ("[T]here is constitutional error in a defendant's sentencing procedures when drug quantity increases a defendant's sentence beyond the prescribed statutory maximum under § 841(b)(1)(C),[11] unless it was submitted to a jury and proven beyond a reasonable doubt."); see also Apprendi v. New Jersey, 530 U.S. 466, 489, 120 S. Ct. 2348,

---

[11] Section 841(b)(1)(C) provides a maximum penalty of 20 years' imprisonment for a § 841(a) offense involving any amount of any controlled substance in Schedule I or II, which includes cocaine. Section 841(b)(1)(B) increases the statutory maximum to 40 years' imprisonment for an offense involving 500 grams or more of cocaine. Section 841(b)(1)(A) increases the statutory maximum to life imprisonment for an offense involving five kilograms or more of cocaine.

2362–63 (2000) (holding that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

Although the jury must determine the quantity and type of drug involved, nothing in the statute, the Constitution, or <u>Apprendi</u> requires the government to prove that the defendant had <u>knowledge</u> of the particular drug type or quantity for which a sentence is enhanced under § 841(b).  Unlike § 841(a), § 841(b)'s penalty scheme imposes no <u>mens rea</u> requirement.[12]  Rather, § 841(b) refers only to a violation of § 841(a) "involving" certain quantities and types of controlled substances.

In other words, <u>Apprendi</u> requires that the indictment must charge—and the jury must find beyond a reasonable doubt—that the offense "involv[ed]" a particular drug type and quantity before a defendant may receive a sentence above the maximum penalty in § 841(b)(1)(C).  But, as other circuits have held, the defendant's <u>knowledge</u> of drug type or quantity is not a fact that increases the statutory maximum penalty, and therefore <u>Apprendi</u> does not require the jury to find that the defendant knew what controlled substance was involved.  <u>See, e.g.,</u>

_____

[12]Sanders's reply brief acknowledges as much, stating: "Sanders does not argue that the district court erred by failing to instruct the jury that the government was required to prove specific intent to possess a particular drug."

25

United States v. Branham, 515 F.3d 1268, 1276 (D.C. Cir. 2008) ("In short, the defendant's knowledge of the type of drug at issue in his offense is not a 'fact that increases the penalty for a crime beyond the prescribed statutory maximum,' and hence is not a fact that 'must be submitted to a jury, and proved beyond a reasonable doubt.'" (quoting Apprendi, 530 U.S. at 490, 120 S.Ct. 2348) (emphasis added)); United States v. King, 345 F.3d 149, 153 (2d Cir. 2003) ("[T]he structure and language of § 841 clearly indicates that the terms 'knowingly or intentionally' in § 841(a) modifies the conduct set forth in that sub-section of the statute, and not the penalty provisions in § 841(b)."); United States v. Brower, 336 F.3d 274, 277 (4th Cir. 2003) ("The holding in Apprendi . . . does not require the Government to prove that [the defendant] knew that he was distributing a substance containing cocaine base and, accordingly, the district court did not err by instructing the jury that the Government needed only to prove that [the defendant] knew that he was distributing a controlled substance."); United States v. Villarce, 323 F.3d 435, 439 (6th Cir. 2003) ("Apprendi does not require proof of knowledge or intent with respect to drug type and quantity."); United States v. Gamez-Gonzalez, 319 F.3d 695, 700 (5th Cir. 2003) ("Knowledge of drug type and quantity is not, in the words of Apprendi, a 'fact that increases the [subsection (b) ] penalty.' The penalty is, instead, based solely on the type and quantity

26

involved in the unlawful act." (quoting Apprendi, 530 U.S. at 490, 120 S. Ct. at 2362) (alteration in original)); United States v. Carranza, 289 F.3d 634, 644 (9th Cir. 2002) ("Apprendi did not change the long established rule that the government need not prove that the defendant knew the type and amount of a controlled substance that he imported or possessed; the government need only show that the defendant knew that he imported or possessed some controlled substance."); United States v. Collazo-Aponte, 281 F.3d 320, 326 (1st Cir. 2002) ("[N]othing in the statutory language of § 841(b) supports a mens rea requirement."); United States v. Barbosa, 271 F.3d 438, 458 (3d Cir. 2001) (same); United States v. Carrera, 259 F.3d 818, 830 (7th Cir. 2001) (same); United States v. Sheppard, 219 F.3d 766, 768 n.2, 769 (8th Cir. 2000) (same).

In Sanders's case, the district court instructed the jury, in varying iterations, that the defendant "only has to have knowledge that it's a controlled substance" and "he does not have to have knowledge that it was actually cocaine that was being possessed." These instructions correctly state the law of our Circuit applying § 841(a) and (b), and the district court did not amend or broaden the indictment by instructing the jury that Sanders did not have to know specifically that he possessed cocaine. See Baker, 432 F.3d at 1233–34.

Although knowledge is not required under § 841(b), Sanders argues that his

27

particular indictment narrowly charges only a "subset" of the statutory offenses—conspiracy to possess and possession of cocaine—rather than the generic crimes of conspiracy to possess and possession of a controlled substance. We disagree because the precise language of his indictment charges controlled substance crimes. For example, Count One charges that Sanders:

> did knowingly combine, conspire, confederate, agree and have a tacit understanding with each other and others known and unknown to the Grand Jury, to commit violations of Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, said conspiracy involving at least five (5) kilograms of cocaine hydrochloride, a Schedule II substance, all in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A)(ii).

The indictment tracks the statutory language of § 841(a) by charging that Sanders conspired to knowingly and intentionally possess with intent to distribute a "controlled substance." Count One charges a generic violation of §§ 841(a) and 846 in which Sanders conspired to knowingly and intentionally distribute "a controlled substance." Count Two similarly charges a generic violation of § 841(a) in which Sanders knowingly possessed with intent to distribute "a controlled substance."[13] We recognize that each count adds sentencing language

___

[13]Count Two charges that Sanders and Salvador Marillo:
aided and abetted by each other and others known and unknown, to knowingly and intentionally possess with intent to distribute a controlled substance, said act involving at least five (5) kilograms of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, all

to give <u>Apprendi</u> notice that the government also charged that the overall conspiracy "involv[ed] at least five (5) kilograms of cocaine." This language, however, is not required for conviction under § 841(a) but is required to set the statutory maximum sentence under § 841(b). Because the indictment charges generic, "controlled substance" violations of §§ 841(a) and 846, the district court correctly instructed the jury that Sanders had to <u>know</u> only that he was conspiring to distribute, and possess with intent to distribute, any controlled substance.

Contrary to Sanders's contention, our decision in <u>United States v. Narog</u>, 372 F.3d 1243 (11th Cir. 2004), does not help him. In <u>Narog</u>, the defendants were charged with conspiring to possess and distribute <u>pseudoephedrine</u> "<u>knowing</u> and having reasonable cause to believe that <u>the listed chemical</u> [pseudoephedrine] <u>would be used to manufacture a controlled substance, that is, methamphetamine</u>." <u>Id.</u> at 1246 (emphasis added). The government prosecuted the <u>Narog</u> case only as a methamphetamine-production case. There was no evidence that the pseudoephedrine pills would be used to manufacture a controlled substance other than methamphetamine. <u>Id.</u> at 1247. Therefore, the jury should have been instructed that the term "controlled substance" "was synonymous with

---

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii), and Title 18, United States Code, Section 2.

Given the parallel structure of Counts One and Two, we read them similarly.

methamphetamine." Id. at 1249. Reversing the defendants' convictions in Narog, this Court concluded that the phrase "that is, methamphetamine" in the indictment "essentially charged a subset of the statutory crime." Id. We also stressed that the jury "may well have convicted appellants of believing that the pills would be used to manufacture a controlled substance other than the one specified therein, although there was no evidence of such." Id. (emphasis added). This Court concluded that the district court's instructions unconstitutionally broadened the indictment. Id.[14]

The material differences here are threefold. First, Sanders's indictment charges generic violations of § 841(a)(1), "that is, to knowingly and intentionally distribute and possess with intent to distribute a controlled substance." Unlike Narog, the phrase "that is" in Sanders's indictment is followed by "controlled substance." Second, unlike in Narog, there was ample evidence that Sanders knew he was transporting a controlled substance, and there is no danger that Sanders was convicted for an offense not charged by the grand jury. See United States v. Behety, 32 F.3d 503, 509 (11th Cir. 1994) ("The danger that we are concerned

---

[14]During deliberations, the jury asked about the "that is" clause: "Did a defendant have to have knowledge or reasonable cause to believe the pseudoephedrine would be used to make specifically methamphetamine to be guilty?" Id. at 1247. Yet, the district court responded that the government did not have to prove that the defendant knew the exact nature of the controlled substance to be manufactured, only that the defendant knew the pseudoephedrine would be used to manufacture some controlled substance. Id.

30

with is that a defendant may have been convicted on a ground not alleged by the grand jury's indictment." (quotation marks omitted)).

Third, although the indictment here goes further and adds the type and amount of drug in the conspiracy, that indictment fairly read is not charging that Sanders had <u>knowledge</u> of that type or amount of drug but is charging that the overall conspiracy involved that type and amount of drug. Rather, the best reading of Count One is that the four named defendants, including Sanders, knowingly entered into a conspiracy with intent to distribute a controlled substance, and at least five kilograms of cocaine were involved. And, unlike in <u>Narog</u>, the jury's special verdict form in Sanders's trial specifically finds that the conspiracy involved five kilograms or more of cocaine.

Finally, Sanders argues that the district court erroneously responded to the jury's question by referring to marijuana and to the "weight and quantity of cocaine or some other drug, if there was some other drug."[15] Sanders's argument

---

[15] We review for abuse of discretion the district court's response to a jury question. <u>United States v. Lopez</u>, 590 F.3d 1238, 1247 (11th Cir. 2009). Although the district court enjoys "considerable discretion regarding the extent and character of supplemental jury instructions, it does not have discretion to misstate the law or confuse the jury." <u>Id.</u> at 1247–48. "A challenged supplemental jury instruction is reviewed as part of the entire jury charge, in light of the indictment, evidence presented and argument of counsel to determine whether the jury was misled and whether the jury understood the issues." <u>Id.</u> at 1248 (quotation marks omitted). As noted above, however, we review the correctness of jury instructions <u>de novo</u> to determine if they misstate the law or mislead the jury to the prejudice of the objecting party. <u>Id.</u> at 1248 n.7.

31

ignores that the district court also instructed that Sanders had "to have knowledge that it was a controlled substance. [The controlled substance] may turn out to be cocaine or whatever it is, and then you have to determine the amounts for sentencing calculations under the sentencing guidelines."[16]

---

[16] The portion of transcript to which Sanders refers provides in full:

["Cocaine" and "controlled substance"] are not totally interchangeable because "controlled substance" is a broader term than "cocaine." It includes many things, marijuana, and there are various schedules of controlled substances, it includes methamphetamine and other drugs.

In this case, as you've read the indictment and that's what's apparently causing you some concern, it charges the defendant either in the conspiracy count or substantive count, whichever one you want to deal with, but I'll deal with the substantive because that's a little simpler, with knowingly and intentionally possessing with intent to distribute a controlled substance. And then it goes on to modify that by saying, said act involving at least five kilograms of a mixture and substance containing a detectable amount of cocaine hydrochloride, which is the more technical name.

Now, maybe I should tell you at this time in language that I did not use previously, the purpose for those three determinations of weights [in the verdict form] relates not to anything you are to do except to find how much—what weight and quantity of cocaine or some other drug, if there was some other drug, you found goes to the determination that the court must use at sentencing time. And that's the reason for the determination of amounts. Otherwise, the word "cocaine" and the weight wouldn't be there at all, it would just be "controlled substance."

Now, where the problem came is an argument was made that the defendant had to have knowledge that what . . . he was transporting was, in fact, cocaine. He only has to have knowledge that it's a controlled substance, and that's the distinction I think the lawyers are arguing about presenting to you, and that he does not have to have knowledge that it was actually cocaine that was being possessed. He has to have knowledge that it was a controlled substance. It may turn out to be cocaine or it may turn out to be marijuana or it may turn out to be methamphetamine or whatever it is, and then you have to determine the amounts for sentencing calculations under the sentencing guidelines. But that's not a concern of yours except to determine that amounts that you say. But beyond that, it's not your concern. I will have to deal with that.

32

Although the district court referred to other drugs, the jury charge as a whole correctly explains the knowledge required to convict Sanders of the offenses charged in the indictment: Sanders had to know that he was possessing a controlled substance but did not have to know that the substance was cocaine. And, contrary to Sanders's argument, the district court did not relieve the government of its burden to show that five kilograms or more of cocaine were involved in the offenses. The district court correctly noted that the government retained the burden to identify the type and quantity of drugs involved in the offenses and that the jury had to find the drug types and quantities only after determining whether Sanders had committed the charged offenses.

In sum, the grand jury charged Sanders with §§ 841(a) and 846 offenses "involving" five kilograms of cocaine, the government presented unrebutted evidence that 153 kilograms of cocaine were found in Sanders's tractor–trailer, and the jury specifically found in its special verdict that each offense involved five kilograms or more of cocaine. After considering the district court's instructions in context and in light of the trial evidence and the jury's special verdict, we conclude that the jury was not misled into convicting Sanders of a crime for which he was not indicted. Because Sanders could not have been convicted of an offense for which he was not indicted, the district court's jury charge did not

33

constructively amend or broaden the indictment.  See Starke, 62 F.3d at 1380.

## B. Admission of Sanders's Prior Drug Conviction

Sanders next argues that the district court erred by admitting into evidence his 1988 conviction for selling 1.4 grams of marijuana.  Relying on Rule 404(b) of the Federal Rules of Evidence, Sanders argues that any probative value of the prior conviction was diminished by the 22-year gap between the prior conviction and the current trial, that the lack of similarity between a street-level sale and a 153-kilogram trafficking conspiracy reduced the prior conviction's probative value, and that the government had no incremental need to introduce the 1988 conviction in light of all the other evidence.[17]

Rule 404(b) prohibits evidence of another crime, wrong, or act to prove a person's character in order to show action in conformity therewith.  FED. R. EVID. 404(b).  This type of evidence is admissible, however, for another purpose, such as to prove motive, intent, or absence of mistake or accident (provided that the government provides reasonable notice of the general nature of the evidence to be

---

[17] We review for abuse of discretion the district court's decision to admit under Rule 404(b) Sanders's prior conviction for selling marijuana.  See United States v. Lampley, 68 F.3d 1296, 1299 (11th Cir. 1995).  However, "evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990).

introduced at trial). Id. Rule 404(b) "is one of inclusion which allows extrinsic evidence unless it tends to prove only criminal propensity. The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite." United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008) (quotation marks and alteration omitted).

To be admissible, the Rule 404(b) evidence (1) "must be relevant to an issue other than the defendant's character," (2) "there must be sufficient proof" to allow a jury to find that the defendant committed the extrinsic act, and (3) the evidence "must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403." United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc). Regarding the first element, a not-guilty plea to a conspiracy charge "'renders the defendant's intent a material issue . . . unless the defendant affirmatively takes the issue of intent out of the case.'" United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005) (quoting United States v. Roberts, 619 F.2d 379, 383 (5th Cir. 1980)) (internal quotation marks and alterations omitted).

Furthermore, our precedent holds that "[e]vidence of prior drug dealings is highly probative of intent to distribute a controlled substance, as well as involvement in a conspiracy." Matthews, 431 F.3d at 1311. Indeed, "virtually any

35

prior drug offense [is] probative of the intent to engage in a drug conspiracy." Id.

Because Sanders pleaded not guilty to the conspiracy charge, his intent was at

issue, and the first element was established. The second element was also met

because Sanders was convicted of the prior act of selling marijuana. Thus, the

issue for the district court was whether the undue prejudice from the character

evidence substantially outweighed the probative value of the prior conviction.

We conclude that the district court abused its discretion by admitting this

particular 22-year-old, 1.4-gram-marijuana conviction. Although we have

declined to establish a bright-line rule for when a prior conviction is too old to be

admissible, Sanders's 22-year-old conviction is nearly fifty percent older than the

oldest conviction we have previously allowed. See United States v. Lampley, 68

F.3d 1296, 1300 (11th Cir. 1995) (holding that a 15-year-old drug conviction was

not so remote that it lacked any probative value to show the defendant's intent to

traffic cocaine). Furthermore, Sanders's prior conviction was for a street-level

sale of 1.4 grams of marijuana, and the current charges involved an international

conspiracy to traffic 153 kilograms of cocaine. Given the factual combination

here of the lengthy time span, the extremely disparate amounts of different drugs,

and the materially differing roles in the offenses, we conclude that Sanders's prior

conviction had virtually no probative value in establishing Sanders's intent to

enter into the present conspiracy.  Allowing the government to admit such a remote and factually dissimilar conviction would effectively create a per se rule of admissibility of any prior drug conviction in drug conspiracy cases—no matter how old or how different.  Our precedent does not create such a rule, and we decline to adopt one today.  Because Sanders's prior 1988 conviction involving 1.4 grams of marijuana had so little, if any, probative value, the district court abused its discretion by admitting the conviction.

Nevertheless, the paucity of probative value creates an additional problem for Sanders—the remoteness and dissimilarity of the prior conviction not only decreases the probative value to show intent but also diminishes the potential for unfair prejudice.  In other words, the prior conviction was so old and dissimilar that it is unlikely that the jury convicted Sanders because of the prior conviction, either because the jury believed Sanders should still be in jail for the prior conviction, or because the conviction demonstrates a propensity to transport large quantities of drugs in a tractor–trailer from Texas to North Carolina.

Given the abundant evidence admitted at trial, we conclude that the district court's admission of the prior conviction was harmless error.  As described above, Sanders's co-conspirator Eric Reyes testified that Sanders drove a previous load of 7,700 pounds of marijuana from Texas to North Carolina.  Reyes testified that

Sanders knew that he was transporting narcotics. Although a truck driver would typically charge $3,300.00 for such a trip, Sanders received $9,000.00 and 40 pounds of marijuana for this trip. Additionally, co-conspirator Aaron Richards testified that Sanders planned to take a different route for his second trip because he encountered too many cops on the route he took during his last trip.

The other trial evidence fully corroborated the co-conspirator testimony. Importantly, Sanders was arrested while driving a tractor–trailer loaded with 153 kilograms of cocaine hidden in a pallet of rotten cabbages. Although Sanders admitted that he knew that the refrigeration unit on the trailer was broken and that he was hauling perishable cabbages, the bill of lading (that Sanders gave the GSP officer) showed that Sanders accepted the load on May 4th and was stopped on May 7th in Georgia. The trip from Texas to North Carolina typically takes only 18 to 20 hours—in other words, despite hauling perishable goods with a broken refrigeration unit, Sanders had not completed the one-day trip in the three days since picking up his load. Furthermore, Sanders had a receipt showing that he had maintenance performed on the truck on May 6th—the day before he was stopped—but the receipt showed no effort to repair the broken refrigeration unit.

In sum, although the district court abused its discretion by admitting Sanders's 1988 conviction for selling 1.4 grams of marijuana, the error was

harmless in light of the overwhelming evidence presented at trial.

**AFFIRMED.**