[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10682
_____

D. C. Docket No. 2:10-cr-00483-AAK-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CORDERELL DEWAYNE CARSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 31, 2013)

Before HULL, WILSON and FARRIS,[*] Circuit Judges.

HULL, Circuit Judge:

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Following a jury trial, Defendant-Appellant Corderell Dewayne Carson appeals his convictions and sentences for one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and three counts of using a telephone to facilitate that drug trafficking conspiracy, in violation of 21 U.S.C. § 843(b). After oral argument and careful review of the briefs and record, we affirm.

## I. BACKGROUND

We recount the background facts of this case in the light most favorable to the government. United States v. Tobin, 676 F.3d 1264, 1270 (11th Cir. 2012). We also describe the relevant procedural history.

### A. Investigation of Drug Sale Activity at 1239 McDonald Street

In 2009, the Jefferson County Sheriff's Office in Alabama and the FBI launched a joint investigation into suspected drug activity centered at a house located at 1239 McDonald Street in Brighton, Alabama. The focus of the investigation soon turned to Carlos Riggs, who resided at 1239 McDonald Street.

Riggs began selling Oxycontin, a brand of oxycodone, in 2006. Riggs was supplied with 80-milligram Oxycontin pills by Brandon Moody. Within a few months, Riggs's operation became big business, and Riggs began recruiting dealers to help him sell the Oxycontin, including his brother, Marlon Riggs. Carlos Riggs would sell the Oxycontin pills to his dealers for $40 or so per pill; in turn, the

dealers would sell the pills to customers at a slightly increased price to make a small profit.  Most often, Riggs "fronted" the pills to his dealers, requiring payment only after the pills were sold, or the dealer returned the unsold pills.  Riggs's dealers operated out of the yard at 1239 McDonald Street.  Riggs also allowed other suppliers to distribute Oxycontin pills to the dealers in the yard.  Sometimes Carlos Riggs would even buy pills from his dealers.  The distribution ring moved 2,000 to 4,000 80-miligram Oxycontin pills every 14 days or so for a period of two years.

In June 2010, Carlos Riggs was arrested on a parole revocation unrelated to this case.  Despite Riggs going to jail, the drug sale business at 1239 McDonald Street continued and even thrived.  Carlos Riggs's cousin, Cameron White, took over the operation.

Around the same time, the maker of Oxycontin, Perdue Pharmaceuticals, reformulated the pill in an effort to prevent abuse.  The new pills—nicknamed "OPs"—turned into gel when crushed, and as a result could not be snorted or shot-up, reducing the pills' value as an illicit drug.  As a result, in 2010, some of the dealers at 1239 McDonald Street began selling heroin instead of Oxycontin.

**B.    Defendant Corderell Carson**

Corderell Carson grew up on McDonald Street, and at the time of the charged conspiracy, lived at 1250 McDonald Street.  Carson was, in his terms, a

3

small-time drug dealer who sometimes operated on McDonald Street.

Carson grew up with the Riggs brothers and was especially good friends with Marlon Riggs. Carson concedes that on three occasions, he bought drugs from members of the Riggs organization when Carson's own supplier ran out.

However, later at his trial, Carson's codefendants would testify that Carson was one of the busiest dealers of the Riggs organization. According to the codefendants, when the Riggs operation began selling heroin on McDonald Street, so did Carson. Indeed, a codefendant claimed that Carson became the main source of heroin. Carson sold codefendant Cameron White three grams of heroin three or four times a week from September 2010 to January 2011.

As a result of his continued presence at or in the vicinity of 1239 McDonald Street, Carson himself became a target of the law enforcement investigation. Carson had three encounters with law enforcement relevant to this appeal.

### 1.     November 4, 2009 Traffic Stop and Search

On November 4, 2009,[1] Jefferson County Sheriff's Office Detective Jacob Bradley pulled Carson over for several traffic violations, about five to six blocks from 1239 McDonald Street. Detective Bradley was familiar with Carson as he was aware of the investigation at 1239 McDonald Street and had seen Carson at

---

[1]Although the police report indicates the stop occurred on November 5, 2009, Detective Jacob Bradley conceded at the suppression hearing that the event actually occurred on November 4, and his report was written on November 5.

4

that location.  After Detective Bradley told Carson why he had been stopped, Carson consented to a search of his vehicle.

Upon conducting the search, Detective Bradley found and seized two loaded guns in the console of Carson's vehicle: a Heckler and Koch .45 caliber handgun and a Smith and Wesson .40 caliber handgun.  Detective Bradley also found and seized $2,000 in cash from the vehicle.

### 2.    September 23, 2010 Encounter

On September 23, 2010, the law enforcement task force investigating the drug activity executed a search warrant at 1239 McDonald Street.

While the search of 1239 McDonald Street was being conducted, three plainclothes law enforcement officers, Sergeant Victor Sims, Sergeant Cameron Beedle, and another sergeant of the Homewood Police Department, were patrolling in an unmarked patrol car on a nearby street in an attempt to maintain a perimeter around 1239 McDonald Street.  While patrolling, Sgt. Sims saw Carson emerge on foot from a line of bushes beside the road, which he found suspicious.  After Sgt. Sims pointed Carson out, Sgt. Beedle, who was on the drug investigation task force, recognized Carson as a target of the drug investigation.

The officers stopped Carson and asked him to place his hands on the patrol car so that the officers could conduct a frisk and ensure he was unarmed.  Sgt. Beedle and Sgt. Sims then frisked Carson.  The officers felt a "wad" in Carson's

front pants pocket.  Sgt. Sims asked Carson what the wad was, and Carson said money.  The officers asked Carson if they could pull the money out of his pocket to verify it was money, and Carson said yes.  The officers discovered it was $1,440 in cash.  The officers then asked Carson where he got it.  Carson answered that he had just cashed his check from working at a steel plant in North Birmingham.

Sgt. Beedle asked why Carson was in the area.  Carson responded that he was visiting a girl.  Sgt. Sims asked Carson why he was coming out of the bushes, and Carson stated, "I was cutting through the cut," and "I don't know my way around here."  Sgt. Beedle knew that Carson's home was on the street—in fact, Sgt. Beedle said Carson's home was visible from where they had stopped Carson—and told Carson, "[y]ou live right there."  Carson denied it and told the officers that he resided in North Birmingham, the address on his driver's license.  Sgt. Sims kept the $1,440 in cash with Carson's apparent permission.

Sgt. Beedle and Sgt. Sims then took Carson to 1239 McDonald Street, about three or four houses down, and to FBI Special Agent Wayne Gerhardt, Jefferson County Sheriff's Office Sergeant Hattie French, and Jefferson County Sheriff's Office Sergeant Dannielle Jackson.  Carson was not placed in handcuffs.  Sgt. Sims and Sgt. Beedle handed Carson's identification and the money to the onsite agents and returned to their post securing the perimeter.

The onsite agents asked Carson where he worked.  Carson answered that he

6

worked at a Shell gas station, breaking down boxes.  The agents asked if they could verify Carson's employment; Carson told them he was paid under the table, about $350 per week.  Special Agent Gerhardt then had an IRS agent, Ezra Heath, come over.  The agents asked Carson if he had paid taxes on the money, and Carson said he had not.  Carson's money was permanently seized.  Special Agent Gerhardt received Carson's money and provided Carson with a receipt.  Gerhardt also wrote on the receipt his name and the telephone number for the FBI office in Birmingham in case Carson wanted to contact him.

Carson was not advised of his Miranda[2] rights at any point during this encounter.

### 3.    January 5, 2011 Search of Carson's Home

On January 5, 2011, law enforcement executed several arrest warrants on a number of suspects in the drug investigation, including Carson.  Law enforcement went to Carson's home to execute the arrest warrant.  While there, as stated in the officer's affidavit in support of the subsequent search warrant, officers "observed a large amount of U.S. Currency on the couch in the living room, marijuana on the coffee table, box of sandwich bags, and a loaded magazine that belong[ed] to an assault rifle on the bed."  Officers also "smelled a strong odor of raw marijuana throughout the residence."  Due to the strong odor, the officers "based on training

---

[2]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

7

and experience," believed "additional marijuana and other illegal drugs [could be] stored at the location." Law enforcement arrested Carson, secured the residence, and sought a warrant to search the remainder of the house.

A search warrant was obtained for the following described property in Carson's house: "Drug proceeds, records, Controlled Substance marijuana, drug paraphernalia, and items as outlined in Attachment 1 (items common to the drug trade) and other evidence of illegal activity." Attachment 1 to the search warrant listed a number of items, including those in Paragraph 11: "Any and all other material evidence of violations of Criminal Code of Alabama, together with fruits, instrumentalities and evidence of crimes at this time unknown."

Under the search warrant law enforcement seized 30 items from Carson's home, including items not mentioned in the warrant, such as a camcorder, two televisions, a DVD player, a PS3 game system, a cable modem, a motorcycle helmet, and two automobiles. Law enforcement also located and seized $5,877 in cash, scattered between the living room, a bedroom, and in a shoebox in an air conditioning vent. Law enforcement also found and seized two guns: an assault rifle, a Ruger SR-556, hidden inside an air conditioning vent, and a handgun, a Ruger SR9, hidden in the attic crawl space. They also found a small quantity of marijuana.

### 4.    Intercepted Phone Calls

8

The task force used a variety of techniques to investigate the suspected drug activity at 1239 McDonald Street, including controlled buys. However, the controlled buys were only marginally successful, as law enforcement was limited in the amount it could purchase due to the high price of the Oxycontin pills. Search warrants executed at 1239 McDonald Street were mostly unfruitful because the location was not a stash house and no drugs or cash were ever found inside. And due to the nature of the drugs, customers would often ingest the Oxycontin pills before leaving the street after purchasing them, making immediate stops of suspected customers unproductive.

Ultimately, law enforcement sought and obtained authorization to conduct three wiretaps. When Carlos Riggs went to jail, law enforcement used the wiretaps on the telephones of Cameron White (who made several calls to Carlos Riggs while in jail), Brandon Moody (the alleged supplier of Oxycontin), and Marlon Riggs (who law enforcement thought might take over the operation after Carlos Riggs's arrest).

Carson participated or was mentioned in the following intercepted calls.

In an intercepted phone call on July 26, 2010, Carson called Marlon Riggs and asked to speak with another dealer, Gavin Walker. In the course of the conversation, Carson told Walker: "Dude in the . . . little heating van, the little AC dude. He['s] fixing to pull up. Give him a[n] old car." An "old car" or "car"

9

refers to an Oxycontin pill.

In an August 9, 2010 phone call, Carson called Marlon Riggs and warned him: "The folks on Watts now," referring to the drug investigation task force.

On August 11, 2010, Carson called Marlon Riggs and asked, "You got some cars?"[3] Marlon Riggs responded that he did not.

In a phone call on September 9, 2010, Carson called Cameron White and said, "You still got some hero?" White replied, "Yeah, I'm [a]bout [to] pull up at the spot now."[4] "Hero" refers to heroin, and "the spot" refers to 1239 McDonald Street.

In another call on September 9, 2010, White called an unidentified male. The unidentified male asked if White had "some of that boy." "Boy" is another term for heroin. White responded, "Yeah, but . . . I ain't in Brighton right now." The unidentified male asked if White had left some with someone. White stated, "Yeah, they got some down there. Little Ike got it down there at the spot. Wayne got some too." "Wayne" is Carson's nickname.

In a September 10, 2010 call, Gavin Walker asked Cameron White, "Where that skillet at?" White answered, "Damn Wayne had that bitch last." A "skillet" refers to a digital scale.

---

[3]This phone call serves as the basis for Count 20, charging Carson with use of a communication facility in furtherance of a drug trafficking offense, in violation of § 843(b).

[4]This phone call serves as the basis for Count 33, charging Carson with use of a communication facility in furtherance of a drug trafficking offense, in violation of § 843(b).

On September 12, 2010, Walker called White and asked if anyone had any "boy." White responded that he had "been trying to get . . . some." In the course of the conversation, White asked "who all down there," to which Walker replied, "Me, Wayne, Fatboy . . ."

In a September 14, 2010 call, Carson called White and told him, "Tell [Ike] white boy [is fixing] to pull up . . . in about 30 seconds." White is then heard telling someone, "White boy is about to pull up in [a]bout 30 seconds wanting them OPs. Want them OPs. . . . [He] need them three."[5] "OPs" are a nickname for the reformulated Oxycontin pills.

On September 18, 2010, Carlos Riggs called White from jail. In that call, White complained to Riggs that Carson was not helping out at "the spot" and when the "[b]ill man come around, he take off runnin'."

In a September 19, 2010 intercepted phone call, Carson called White and asked if he "got some Ps?" "Ps" refer to Oxycontin pills. In a phone call later that same day, Carson called White again and asked if he "got some dog food?" White answered, "Yea there is some dog food at the house." Later in the conversation Carson asked, "You know what I'm talking about man?" In response, White said, "Oh, you talking about that dog food. No there ain't no more of that. No I need to get some of that." "Dog food" is a nickname for heroin. But Carson and White

---

[5]This phone call serves as the basis for Count 40, charging Carson with use of a communication facility in furtherance of a drug trafficking offense, in violation of § 843(b).

also had dogs, so the phone call may have referred to actual dog food.

On September 20, 2010, Carson called White. White said, "I was fixing to see if you had some of them OPs up there." Carson responded, "All right, I'll try to get you some down there in a minute."

In a September 24, 2010 phone call, Carson again called White asking "how many cars you got?" White said he only had one. Carson responded, "Bring me that one."

## C.    The Superseding Indictment

On March 30, 2011, the government filed a superseding indictment charging Defendant Carson and 17 other defendants[6] with a number of offenses related to the alleged Oxycontin and heroin drug sale operation at 1239 McDonald Street. Specifically, the superseding indictment charged Carson with a conspiracy to possess with the intent to distribute or distribute controlled substances lasting from May 2008 to December 12, 2010 in violation of 21 U.S.C. § 846 (Count 1), three counts of using a telephone to facilitate a drug trafficking offense in violation of 21 U.S.C. § 843(b) (Counts 20, 33, and 40), and one count of possessing a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count 59).

With regard to Count 1, all defendants were charged with conspiring to

---

[6]These codefendants included Carlos Riggs, Marlon Riggs, Gavin Walker, and Cameron White, among others.

12

possess with the intent to distribute or distribute:

> 100 grams or more of a mixture and substance containing a detectible amount of heroin . . . , a mixture and substance containing a detectable amount of cocaine hydrochloride, . . . and an amount of oxycodone (Oxycontin), . . . and a mixture and substance containing a detectable amount of marijuana.

Carson was the only defendant to proceed to a trial. All other defendants pled guilty and entered into plea agreements with the government.

### D.    Pretrial Motions

Prior to trial, Carson filed three motions to suppress: (1) a motion to suppress evidence found in the January 5, 2011 search of his home; (2) a motion to suppress the cash and guns found in Carson's vehicle in the November 2009 traffic stop; and (3) a motion to suppress the cash found on Carson's person and the statements Carson made during the September 23, 2010 police encounter.

#### 1.    First Motion to Suppress

In his first motion to suppress, Carson argued that his home was searched pursuant to an unconstitutional general warrant. Specifically, the warrant permitted officers to seize "Drug proceeds, records, Controlled Substance marijuana, drug paraphernalia, and items as outlined in Attachment 1 (items common to the drug trade) and other evidence of illegal activity." Attachment 1 included a list of 11 rather broad categories, including paragraph 11: "Any and all other material evidence of violations of Criminal Code of Alabama, together with

fruits, instrumentalities and evidence of crimes at this time unknown." Carson alleged that the warrant impermissibly allowed law enforcement to seize almost anything, and that the "unlawfulness of the warrant was so plain that it was unreasonable for any competent officer to rely upon it in good faith."

The matter proceeded to a magistrate judge. The magistrate judge first set the motion for an evidentiary hearing, but the parties agreed that the issue could be resolved without a hearing based on the pleadings. The magistrate judge then issued Findings and Recommendations, ultimately recommending that the motion to suppress should be denied because "[t]he good faith exception of Leon is applicable to the acquisition and execution of a warrant in this case."

The magistrate judge rejected the government's alternative arguments that it was not a general warrant or that the unconstitutional parts of the warrant could be severed. First, the magistrate judge noted that in Andresen v. Maryland, 427 U.S. 463, 96 S. Ct. 2737 (1969), the Supreme Court had held that a warrant was not unconstitutionally overbroad when it included, at the end of a list of items to be seized, a general clause authorizing seizure of "other fruits, instrumentalities and evidence of crime at this [time] unknown." Id. at 479, 96 S. Ct. at 2748. But the magistrate judge also observed that "[t]he lynchpin in Andresen was the fact that the overly broad phrase appeared after a colon preceding the description of items to be seized." Viewing the Andresen warrant in context: (1) the general clause in

14

Andresen was not in its own sentence and was part of a series following a list of "items pertaining to . . . lot 13, block T" (the property to be searched) and a colon; and (2) the word "crime" in the general clause was limited to the crime of false pretenses charged in relation to "lot 13, block T." Id. at 480–82, 96 S. Ct. at 2748–49. Here, however, the warrant's Attachment 1 "stands alone," and "by its own terms is not limited in scope because no limiting clause precedes the more general clauses."

The magistrate judge also rejected the government's alternative argument that any unconstitutional portion of the warrant could be severed from those portions supporting probable cause. The magistrate judge concluded that this could not be done here where it was impossible "to determine whether the seizures were made pursuant to the unlawful general provision of the warrant or the more limited one."

However, the magistrate judge determined that the good faith exception of United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984), should be applied to the search conducted pursuant to the warrant. The magistrate judge first observed that the following question had been put to the parties:

> whether an officer obtaining a search warrant from a Jefferson County [state] judge containing language which had previously been determined by a judge of the United States District Court for the Northern District of Alabama to be in violation of the Fourth Amendment's specificity requirements could be said to have acted in objective good faith in relying on a warrant with similar defects.

The magistrate judge agreed with the government that a U.S. district court judge's determination was not binding, and further observed that the Eleventh Circuit had later held Leon's good faith exception was applicable to the warrant in that case in an unpublished affirmance.

The magistrate judge found the warrant in this case "far more limited in scope" than that in the Northern District of Alabama case. Specifically, "the broad definition of paragraph 11 [in Attachment 1] is expressly cabined by the limitation describing Attachment 1 on the face of the warrant": "(items common to the drug trade)." Thus, the warrant was "limited to evidence and, therefore, presumably violations of law common to the drug trade as opposed to a more broad definition of items to be seized and unspecific offenses." Accordingly, the magistrate judge concluded that law enforcement could in good faith rely upon the warrant and recommended Carson's motion to suppress be denied.

### 2.    Second and Third Motions to Suppress

Carson's second motion to suppress sought to exclude the admission of the firearms and money seized in the November 2009 search of his vehicle. In a third motion to suppress, Carson sought to suppress evidence obtained in the September 2010 encounter. Specifically, Carson sought to exclude admission as evidence: (1) the $1,440 in cash found on Carson's person; and (2) the statements he made to law enforcement during the encounter. Carson argued that the statements should

16

be suppressed because he was in custody when the statements were made and he was at no time advised of his <u>Miranda</u> rights.

The magistrate judge conducted a suppression hearing regarding Carson's second and third motions to suppress. At the suppression hearing, the government presented the testimony of Detective Jacob Bradley concerning the November 4, 2009 traffic stop and search, and the testimony of Sergeant Victor Sims, Sergeant Cameron Beedle, and Sergeant Dannielle Jackson concerning the September 2010 stop.

The officers testified to the events described above in relation to the September 2010 stop. Notably, on cross-examination of Sgt. Sims, defense counsel questioned Sgt. Sims about conducting the pat-down of Carson:

> [Defense Counsel:] Well—now, when you patted [Carson] down, you put him on the—pat him down?
> [Sgt. Sims:] Yes, sir.
> [Defense Counsel:] You're looking for weapons?
> [Sgt. Sims:] Yes, sir.
> [Defense Counsel:] Did you find any weapons?
> [Sgt. Sims:] No, sir.
> [Defense Counsel:] Did you find anything that was hard?
> [Sgt. Sims:] Not that I can recall, no, sir.
> [Defense Counsel:] But then you saw something soft?
> [Sgt. Sims:] Yes, sir.
> [Defense Counsel:] Did you think that was a weapon?
> [Sgt. Sims:] No, sir. I recognized it as money, as a roll of money.
> [Defense Counsel:] But when you patted him down, did you think it was a weapon?
> [Sgt. Sims:] No, sir.
> [Defense Counsel:] But you asked him what it was?
> [Sgt. Sims:] Yes, sir.

17

[Defense Counsel:] <u>At that time, [Carson] had—not spreading but had his hands on the car?</u>
[Sgt. Sims:] <u>Yes, sir.</u>
[Defense Counsel:] <u>Was he free to go?</u>
[Sgt. Sims:] <u>He was not free to go, per se.</u>
[Defense Counsel:] All right.  Well, when you asked him those questions, did you—before you asked him those questions, did you give him his rights?
[Sgt. Sims:] I didn't read him his rights, no, sir.
[Defense Counsel:] Did anybody read him his rights at that time?
[Sgt. Sims:] No, sir.
[Defense Counsel:] All right.  And then you got the money?
[Sgt. Sims:] I asked him, and he gave me permission.

After the suppression hearing, the magistrate judge issued Findings and Recommendations.

The magistrate judge first recommended denying Carson's motion to suppress the evidence obtained in the November 2009 search of his car because Detective Bradley had probable cause to stop Carson's car, Detective Bradley's questions during the stop were constitutionally permissible, and Carson's consent to the search of the car and seizure of the cash and guns was voluntary.

The magistrate judge also recommended denying Carson's motion to suppress the evidence of the cash and Carson's statements made during the September 2010 stop.  Most relevant here, the magistrate judge made this recommendation because: (1) the <u>Terry</u>[7] stop of Carson was based on reasonable suspicion that he was engaged in criminal activity; (2) Carson consented to

---

[7]<u>Terry v. Ohio</u>, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 1884–85 (1968).

removal of the cash from his pocket; (3) Carson was not in custody for <u>Miranda</u> purposes when he was walked from where he was initially stopped to the agents at 1239 McDonald Street; and (4) Carson was not in custody when he spoke with the onsite agents at 1239 McDonald Street. The magistrate judge stated that "Carson was simply not in custody at the time he made" the statements to the officers, and even after being moved to 1239 McDonald Street, "he was not under arrest. . . . [n]or was Mr. Carson in custody" for purposes of <u>Miranda</u>.

Over Carson's objections to the magistrate judge's findings and recommendations as to all three motions to suppress, the district court concluded that "the magistrate judge's report on all three of these issues is due to be and is hereby adopted, and the recommendations of the magistrate judge are accepted by this Court."

### 3.    Motion in Limine

Carson also filed a motion in limine seeking to exclude items seized from his home in the January 5, 2011 search, specifically the two guns found. Carson argued that these items were: (1) irrelevant to the conspiracy charged in the superseding indictment; and (2) unfairly prejudicial, as he would admit to being a drug user at trial. After hearing argument on the motion in limine, the district court denied it.

### E.    Carson's Trial

Carson's jury trial began on August 29, 2011.

During the first day of trial, Carson's defense counsel objected that it had only received redacted copies of the wiretap applications and orders, and the statute governing these wiretaps required unredacted copies be provided to the defense at least 10 days prior to trial. The government explained that the redactions were related to individuals who were involved in ongoing investigations. Based on the district court's "cursory review," the district court stated that the redactions appeared to be consistent with the government's explanation. The district court overruled defense counsel's objection but ordered the government to provide the defense with unredacted copies of the wiretap applications and orders by the end of the day.

The government furnished these copies the next morning. Despite receiving unredacted copies, defense counsel maintained its argument that "the statute says what it says," and the government's failure to produce unredacted copies of the wiretap applications 10 days prior to trial precluded admission at trial of the intercepted phone calls and other evidence resulting from the wiretaps.

The district court rejected the defense's argument. The district court observed that having reviewed the redacted copies, "the Court believes that they were complete enough for you to have all of the basic elements that you need to cross-examine or to be ready for trial." Further, any prejudice caused by delay in

20

receiving the unredacted copies had been rectified by defense counsel receiving them that day. The district court also told the defense it could have additional time to review the unredacted copies and even offered to delay trial if necessary for defense counsel to complete that review.

In its case-in-chief, the government presented the testimony of numerous law enforcement officers that participated in the investigation, including Special Agent Gerhardt, Sgt. French, Detective Bradley, Sgt. Sims, and Sgt. Beedle; the wiretapped phone conversations involving Carson; and the testimony of several of Carson's codefendants: Carlos Riggs, Marlon Riggs, Cameron White, Gavin Walker, and Demarcus Witt.

The defense case proceeded on a theory that Carson was a small-time drug dealer and drug user, but he was not part of the Riggs organization and thus not a member of the charged conspiracy. The defense called witnesses who testified that Carson visited those he knew at 1239 McDonald Street for social reasons and that he had little discretionary money.

Carson also testified in his defense. First, Carson admitted that he sold drugs beginning in 2009. But Carson denied that his drug dealing was part of the Riggs organization. Carson said his involvement with the Riggs brothers and others in the organization was strictly for "[e]ntertainment purposes."

Carson said he did deal drugs at times on McDonald Street, but claimed that

21

he was kicked off the street three times by Carlos Riggs. And Carson said he purchased from Riggs's dealers only three times when his own supplier ran out. Carson said he otherwise did not deal with the Riggs organization because their prices were higher and he was afraid of Carlos Riggs. On each occasion he dealt with the Riggs organization, Carson had no intention of making it a continuous arrangement.

Notably, Carson did not contest that he participated in the wiretapped phone conversations and that these phone conversations concerned drug transactions—including the three calls that anchored the three counts of using a telephone in furtherance of the drug conspiracy. For the most part, Carson's defense was that the various phone calls referenced individual transactions in line with his own small-time drug dealing and personal drug use. For instance, Carson said that the July 26, 2010 phone call in which he asked Gavin Walker to give a man in a van a pill was to pay for the man's work on Carson's air conditioning unit. In the September 9, 2010 phone call in which Carson asked Cameron White for some heroin, Carson said he was interested in obtaining it only as a customer and planned to use it with a girl. In the phone call referencing dog food, Carson said he meant actual dog food and not heroin.

Carson also testified that the September 18, 2010 phone call between Cameron White and Carlos Riggs referenced a falling out he had with White, and

22

supported his argument that Carlos Riggs often kept him from selling on McDonald Street.

On September 2, 2011, the jury returned its verdict.  The jury found Carson guilty on Count 1 of conspiring to possess with the intent to distribute or distribute oxycodone (Oxycontin) and heroin.  The jury found the conspiracy involved an amount of heroin weighing less than 100 grams.  The jury found Carson guilty as to Counts 20, 33, and 40, charging use of a communication facility in furtherance of a drug trafficking offense.  Lastly, the jury found Carson not guilty on Count 59 charging possession of a firearm in furtherance of a drug trafficking offense.

## F.    Carson's Sentence

On February 1, 2012, the district court entered a judgment sentencing Carson to 210 months' imprisonment as to the drug conspiracy conviction, and 48 months' imprisonment as to each of the three convictions for use of a communication facility to facilitate a drug trafficking offense, all sentences to run concurrently with one another.

Carson filed this timely appeal.

## II.  CARSON'S STATEMENTS IN THE SEPTEMBER 2010 ENCOUNTER

## A.    Standard of Review

"We apply a mixed standard of review to the denial of a defendant's motion to suppress, reviewing the district court's findings of fact for clear error and its

application of law to those facts de novo." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (internal quotation marks omitted).

## B.    Miranda Discussion

On appeal, Carson first argues that the statements he made to law enforcement in the September 2010 encounter should have been suppressed as they were made without Carson first being advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  Specifically, Carson challenges the admission of: (1) his statements to Sergeant Sims and Sergeant Beedle when he was first stopped, including his statement concerning where he obtained the $1,440 in cash; and (2) his statements to Special Agent Gerhardt and Sergeant Jackson after being escorted to 1239 McDonald Street.  Carson maintains he was in custody for the duration of the encounter and was therefore entitled to Miranda warnings prior to any questioning by law enforcement.

The Fifth Amendment provides individuals with a right against self-incrimination.  U.S. Const. amend. V.  In Miranda v. Arizona, the Supreme Court held that the government may not use a defendant's statements elicited during a custodial interrogation against that defendant unless officials provide specific warnings concerning the defendant's rights against self-incrimination beforehand. United States v. Woods, 684 F.3d 1045, 1055 (11th Cir. 2012) (per curiam).

But the trigger for Miranda protections is custody.  A person is in custody

24

for purposes of Miranda if, under the totality of the circumstances, a reasonable person would believe the restraint on his freedom of movement has been curtailed to the degree associated with a formal arrest. United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010). In assessing whether a reasonable person in Carson's position would have understood his freedom of movement to have been curtailed in this way, "we consider the totality of the circumstances, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention." United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (internal quotation marks and citations omitted).

For instance, a person temporarily detained pursuant to an ordinary traffic stop is not "in custody" for the purposes of Miranda. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150 (1984). This Court has further held that a defendant stopped pursuant to Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), is not "in custody" for Miranda purposes where the restraint used is "the minimal amount necessary for such a stop" and the circumstances of the stop do not involve "the type of 'highly intrusive' coercive atmosphere that may require Miranda warnings even before a formal arrest is made." United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004).

Carson alleges that the stop and questioning he was subjected to by law

25

enforcement amounted to custodial interrogation because: (1) he was ordered to place his hands on the patrol car; (2) the officers searched him and took away his money and identification;[8] and (3) the officers then took him to another area for further questioning.  In response, the government argues that Carson was not in custody for Miranda purposes because: (1) he was standing on a public street in public view; (2) he was questioned only briefly; (3) Carson was never placed in handcuffs or arrested; and (4) the officers never brandished their weapons.  Alternatively, the government argues that even if Carson was in custody, any error in the admission of his two statements was harmless.

We need not resolve the custody issue because even assuming that Carson was subjected to custodial interrogation without the benefit of Miranda warnings, "[t]he admission of statements obtained in violation of Miranda is subject to harmless error scrutiny."  United States v. Arbolaez, 450 F.3d 1283, 1292 (11th Cir. 2006) (per curiam).  Under harmless error scrutiny, "[t]he question is whether there is a reasonable probability that the evidence complained of might have contributed to the conviction."  Id. (internal quotation marks omitted).  Thus, we must decide whether "after we subtract the statements that should not have been admitted at [Carson's] trial, the remaining evidence is so overwhelming that we are

[8]Carson's assertion here is premised on the fact that at trial, Sgt. Beedle testified that upon taking Carson to Special Agent Gerhardt and Sgt. Jackson, Sgt. Beedle "handed his identification [to the officers and] said, 'Here's him.  Here's his money.'"  According to Carson, this "prov[es] that they had taken the identification."

26

convinced beyond a reasonable doubt that the improperly admitted evidence did not affect the verdict." United States v. Street, 472 F.3d 1298, 1315 (11th Cir. 2010); see United States v. Gari, 572 F.3d 1352, 1362 (11th Cir. 2009). The government bears the burden to demonstrate that an error was harmless beyond a reasonable doubt. United States v. Lee, 427 F.3d 881, 892 (11th Cir. 2005).

The non-Mirandized statements introduced from the September 2010 encounter were essentially that: (1) Carson first said he had obtained the $1,440 in cash found on his person from working at a steel plant but then said it was payment for breaking down boxes at a Shell gas station; and (2) Carson said he did not live on McDonald Street and was in the area because he had been visiting a girl.[9] Subtracting these two statements Carson made to law enforcement in the September 2010 encounter concerning where he obtained the cash and why he was in the area, the remaining evidence of Carson's guilt is overwhelming.

Carson's testimony alone could support the verdict. First, Carson admitted that he was a drug dealer, and at times he sold drugs, including Oxycontin, on McDonald Street. Carson also acknowledged that he associated with many members of the Riggs organization, particularly Marlon Riggs. On three occasions, Carson conceded he purchased drugs from Riggs organization members when his own supplier ran out, and on one of those occasions he purchased heroin.

---

[9]Carson's other statements during the encounter, including that Carson had been paid "under the table" and had not paid taxes on those earnings, were not admitted at trial.

27

As for the wiretapped phone conversations, Carson admitted it was his voice on the calls, including the three phone calls that served as the bases of the three counts for use of a telephone in furtherance of the drug conspiracy.

While Carson testified fervently that these isolated incidents did not mean he was part of the charged drug conspiracy, the jury was free to not only disbelieve Carson's testimony but also to conclude the exact opposite of what he said was true and to use it as substantive evidence against him. See United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004).

Additionally, Carson's codefendants testified that Carson sold pills at 1239 McDonald Street, both providing Oxycontin pills to Riggs organization members for resale and purchasing pills to sell himself. When the Riggs organization switched from selling Oxycontin to selling heroin, one of Carson's codefendants testified that Carson became a major source of heroin. And despite Carson's assertions that he often purchased the drugs for his own use, a number of Carson's codefendants testified that they had never seen Carson use Oxycontin or heroin.

We must also consider the impact the admission of these two statements had on the other evidence and on Carson's defense. See Arbolaez, 450 F.3d at 1293 ("[T]he court must inquire into (1) the effect of the erroneously admitted statement upon the other evidence introduced at trial, and (2) upon the conduct of the defense." (internal quotation marks omitted)). The admission of these statements

28

showed Carson was inconsistent concerning where he had obtained the cash and about where he lived.  But in the absence of these statements, other evidence showed Carson had $2,000 in cash during the November 2009 traffic stop and $5,877 in cash at his home in the January 2011 search.  More importantly, the testimony of Carson's codefendants significantly undermined his credibility on every key point, even without the statements.  Furthermore, Carson has never indicated that the admission of these two non-Mirandized statements affected his defense in any way.  For example, he has never claimed that he would not have testified had these statements been excluded.

Finally, these statements played little if any role in the government's case against Carson.  The two non-Mirandized statements from the September 2010 encounter, while introduced, were not emphasized by the government during trial, during cross-examination of Carson, or in closing argument.

Accordingly, we are convinced beyond a reasonable doubt that the admission of the statements Carson made without the benefit of <u>Miranda</u> warnings in the September 2010 encounter did not contribute to the jury's verdict.  Thus, we affirm the district court's denial of Carson's motion to suppress the statements.

### III. WARRANT TO SEARCH CARSON'S HOME

**A.    Standard of Review**

As noted above, in reviewing a district court's denial of a motion to

suppress, this Court reviews factual findings for clear error and applications of law de novo. See Tamari, 454 F.3d at 1261. The government says, though, that because the district court's ruling on Carson's motion to suppress the results of the warrant was based entirely on written evidence, this Court's review should be completely de novo. See United States v. Pulvano, 629 F.2d 1151, 1156 (5th Cir. 1980).[10]

## B.    Discussion

On appeal, Carson argues that the district court improperly applied the good faith exception to the warrant requirement in denying his motion to suppress the results of the January 5, 2011 search of his home. Carson argues that a reasonably trained police officer would have known the warrant was unconstitutionally broad because it permitted law enforcement to "seize virtually anything they thought might be connected with any criminal activity." In support, Carson cites the "bare minimum" amount of education Alabama police officers receive regarding criminal procedures and laws.

The government argues that the district court's ruling may be affirmed because: (1) the search warrant was not overly broad and thus not an unconstitutional general warrant; (2) even if overbroad, the unconstitutionally

---

[10]In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to September 30, 1981.

overbroad sections of the warrant may be severed from those portions supported by probable cause; and (3) as the district court held, at the very least, the motion was properly denied on the basis of the good faith exception.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. "The manifest purpose of this particularity requirement was to prevent general searches." Maryland v. Garrison, 480 U.S. 79, 84, 107 S. Ct. 1013, 1016 (1987). The exclusionary rule operates to safeguard Fourth Amendment rights like the particularity requirement for a search warrant. United States v. Calandra, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974).

But under United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1985), the prosecution is not barred from using in its case-in-chief evidence obtained by law enforcement officers that acted in reasonable reliance on a search warrant issued by a detached, neutral magistrate but ultimately found to be invalid. See id. at 913, 104 S. Ct. at 3415. This Court has explained that Leon's good faith exception applies in all but four limited sets of circumstances:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would

31

have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . . ; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal quotation marks omitted).  Here, Carson challenges the application of the good faith exception based on the fourth circumstance.

We conclude that this case does not fit within the fourth circumstance, and thus the district court's ruling that the good faith exception applies is due to be affirmed.

Here, the affidavit specified the location to be searched and the items to be seized, including marijuana, which law enforcement attested to observing at the residence.  The inclusion of a "catch-all" provision in Attachment 1 does not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."  Leon, 468 U.S. at 923, 104 S. Ct. at 3421.  For instance, in Andresen v. Maryland, 427 U.S. 463, 96 S. Ct. 2737 (1976), the Supreme Court concluded that a similarly challenged phrase was constitutional as it "must be read as authorizing only the search for and seizure of evidence relating to" the specific crime at issue.  Id. at 480, 96 S. Ct. at 2748.  While in Andresen,

32

the general clause came after the specific items to be seized and a specified crime to which the items contained in the general clause must relate, in this case, the face of the warrant limited the items in Attachment 1 to those "common to the drug trade." Accordingly, the warrant was not so facially deficient that the executing officers could not have reasonably presumed it was valid. We affirm the district court's denial of Carson's motion to suppress the results of the search warrant.

## IV.  ADMISSION OF THE FIREARMS

### A.    Standard of Review

We review a district court's ruling on the admission of evidence for an abuse of discretion. United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013). "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." Id. (internal quotation marks omitted). Even if Carson succeeds in demonstrating an abuse of discretion in the admission of evidence, "nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." Id. Moreover, "[i]n reviewing issues under Federal Rule of Evidence 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (internal quotation marks and alterations omitted).

### B.    Discussion

33

Carson's third claim is that the admission of the two firearms found in his home was unduly prejudicial, irrelevant, and unnecessary, as he readily conceded that he was a drug dealer and the admission of the firearms served no probative purpose. Carson primarily relies on United States v. Beechum, 582 F.2d 898 (5th Cir. 1978), for the proposition that if the government already possesses a strong case on the defendant's intent to commit a crime or intent is not contested, the probative value of admitting that evidence to prove that intent will be outweighed by prejudice to the defendant. Id. at 914.

We can easily dispense with this argument. First, the evidence was clearly relevant. As we have previously recognized, guns are "tools of the trade" in drug trafficking. See United States v. Lopez, 649 F.3d 1222, 1242 (11th Cir. 2011). And despite Carson's concession that he was a drug dealer, Carson's possession of firearms was highly relevant to the government's argument that Carson was not a small-time drug dealer as he claimed. See also Old Chief v. United States, 519 U.S. 172, 188, 117 S. Ct. 644, 654 (1997) ("Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.").

Finally, Beechum is factually distinguishable. Beechum concerned the

34

circumstance where the government attempted to admit evidence of intent to commit an <u>extrinsic</u> offense and <u>not</u> the offense with which the defendant was charged. 582 F.2d at 911–14. That is not the case here. The firearms evidence was admitted as part of the government's case on the offenses actually charged.

Given the high threshold required to apply the bar of Federal Rule of Evidence 403, we conclude that the district court did not abuse its discretion in declining to apply that bar here and in admitting the evidence of the firearms.

## V. REDACTED WIRETAP APPLICATIONS AND ORDERS

### A.    Standard of Review

This Court reviews an issue of statutory interpretation <u>de novo</u>. <u>United States v. Lanzon</u>, 639 F.3d 1293, 1298 (11th Cir. 2011).

### B.    Discussion

Carson's next argument on appeal is that the contents of the wiretapped conversations and evidence obtained under the wiretaps should have been excluded because "only parts" of the supporting applications and orders were provided to the defense prior to trial.

Pursuant to 18 U.S.C. § 2518(9),

> The <u>contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying</u>

35

<u>application, under which the interception was authorized or approved</u>. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

18 U.S.C. § 2518(9) (emphasis added). In accordance with the statute, the government furnished the defense with copies of the applications and court orders at least 10 days prior to trial. But the copies contained redactions. Upon Carson's objection, the government did provide Carson with unredacted copies at the beginning of the second day of trial.

In response, the government argues that: (1) Carson waived this argument because he did not move to suppress the evidence on this basis; (2) the government complied with the statute's requirements and the statute does not explicitly require disclosure of unredacted copies of the application and order; and (3) even if the statute required unredacted copies, the failure to comply with that requirement caused Carson no prejudice and thus the evidence should not be suppressed.

Despite Carson's failure to move to suppress the evidence, Carson did preserve a timely objection on the basis that the government failed to comply with § 2518(9). Thus, we assume Carson did not waive this claim. We also agree with the government that the statute does not explicitly require the government to furnish the defendant with unredacted copies of a wiretap application and/order, although we can certainly imagine a scenario in which an application and/or order

36

is so heavily redacted that it frustrates the purpose of the disclosure.  But even assuming that Carson did not waive the issue and the statute requires complete copies, we conclude that Carson's claim here fails.

In United States v. Caggiano, a Unit B panel of the Fifth Circuit[11] held that a technical violation of 18 U.S.C. § 2518(8)(b), requiring an issuing judge to seal a wiretap application and order, did not require suppression of the evidence obtained pursuant to the wiretap, so long as "the procedures actually employed fulfilled the purpose of [the statute] and the technical noncompliance did not prejudice the defendants."  667 F.2d 1176, 1178 (5th Cir. Unit B 1982).  The panel observed that "[a] failure to comply with the procedures of . . . § 2518(8)(b) may render an interception unlawful and its fruits inadmissible under 18 U.S.C. § 2518(10)(a)(i)," id. at 1178–79, which provides that an "aggrieved person . . . may move to suppress the contents of any intercepted wire or oral communication . . . , or evidence derived therefrom, on the grounds that . . . the communication was unlawfully intercepted."  18 U.S.C. § 2518(10)(a).  However, "[s]uch technical noncompliance necessitates suppression . . . only if the violated procedure is a central or a functional safeguard in the statutory scheme to prevent abuses of the wiretap act and if the purpose of the procedure has been frustrated or the procedure has been deliberately ignored."  Caggiano, 667 F.2d at 1179.

---

[11]Decisions issued by a Unit B panel of the former Fifth Circuit are binding on this Court. See Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

In applying those principles to <u>Caggiano</u>, the panel first "assume[d] that the sealing requirement is a central or a functional safeguard." <u>Id.</u>  But the defendants failed to show prejudice from this technical violation of § 2518(8)(b): the defendants "have not suggested that the procedure which was in fact employed promoted any breach of confidentiality or that they were in any other way prejudiced by the noncompliance . . . ; nor do they suggest that the government deliberately circumvented the sealing requirement." <u>Id.</u>  Accordingly, the panel held that the contents of the wiretapped conversations were properly admitted into evidence.

This Court has not confronted this issue in the specific context of a government's alleged noncompliance with § 2518(9).  However, the Fourth Circuit, in an unpublished decision, <u>United States v. Owen</u>, 966 F.2d 1445 (4th Cir. 1992) (table), considered a defendant's challenge to the admission of any evidence obtained pursuant to a wiretap when the government did not provide the applications and orders at least 10 days prior to trial, instead providing them on the first day of trial, in violation of § 2518(9). <u>Id.</u> at *1.  Citing our prior panel's opinion in <u>Caggiano</u>, the Fourth Circuit observed that "[t]echnical noncompliance with the wire interception statute necessitates suppression 'only if the violated procedure is a central or a functional safeguard in the statutory scheme to prevent abuses of the wiretap act and if the purpose of the procedure has been frustrated or

38

the procedure has been deliberately ignored.'" Id. at *2 (quoting Caggiano, 667 at 1179).

Applying these principles in Owen, the Fourth Circuit held that the evidence should not be suppressed for the government's technical noncompliance with § 2518(9). Specifically, the defendants in Owen failed to: (1) demonstrate "that the government's failure to furnish them a copy of the court interception order and its application frustrated the purposes of the act or that the government deliberately ignored its procedures"; and (2) "[m]ore importantly, [defendants had] not established that they suffered any prejudice because they did not receive the information until the day trial commenced." Id. at *2.

We conclude that even if providing only redacted copies of the wiretap application and orders technically violated § 2518(9), the district court correctly held that the contents of the communications and evidence obtained pursuant to them should not be suppressed. Certainly the fact that the statute does not explicitly require unredacted copies weighs against a determination that disclosure of unredacted, complete copies is a "central or a functional safeguard in the statutory scheme." But more importantly, Carson does not allege being provided redacted copies prior to trial prejudiced his defense. Indeed, Carson concedes that his only prejudice is the admission of the recordings. Furthermore, the district court informed defense counsel that the trial could be pushed back if necessary so

39

that the defense could fully review and use the unredacted copies. The defense apparently did not take up the district court's offer. Thus, Carson suffered no prejudice from the delay in receiving unredacted copies.

Ultimately, Carson does not demonstrate that the failure to furnish him with complete copies prior to trial frustrated the purpose of the statute or that the government deliberately ignored the statute, and Carson concedes that he suffered no prejudice due to any noncompliance with the statute. We affirm the district court's ruling permitting admission of the wiretap evidence.

## VI. DISCLOSURE OF CODEFENDANTS' PLEA AGREEMENTS

### A.    Standard of Review

This Court reviews de novo alleged Brady/Giglio violations. See United States v. Jones, 601 F.3d 1247, 1266 (11th Cir. 2010).

### B.    Discussion

Carson's fifth argument on appeal is that the government violated Brady[12] and Giglio[13] by failing to disclose that the government had agreed with cooperating codefendants that the government would not disclose evidence of certain drug quantities at the codefendants' sentencings. While Carson concedes that he had the codefendants' plea agreements and knew the attribution amounts agreed to by

---

[12]Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).
[13]Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972).

40

each codefendant, Carson points out that statements in the government's sentencing memorandum demonstrate another component of those plea agreements was not disclosed to him. Specifically, he says the government alludes to this component in his sentencing memorandum when the government states that "the Government agreed not to present additional evidence of drug quantities at [the] sentencing" of the codefendants. Had he known the government agreed with his codefendants not to present evidence of higher quantity amounts, Carson says, "this additional information would have been a sharp tool to use in the cross-examination of the government witnesses."

Under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S. Ct. at 1196–97. In order to establish a Brady claim, the defendant must show that: (1) "the government possessed evidence favorable to the defendant"; (2) "the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence"; (3) "the prosecution suppressed the favorable evidence"; and (4) "had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001) (per curiam) (internal

41

quotation marks omitted).

In Giglio, the Supreme Court applied Brady to hold that, where a witness's credibility is at issue, the government is required to disclose evidence bearing on the witness's credibility. Giglio v. United States, 405 U.S. 150, 154–55, 92 S. Ct. 763, 766 (1972). "Impeachment evidence should be disclosed in time to permit defense counsel to use it effectively in cross-examining the witness." United States v. Jordan, 316 F.3d 1215, 1253 (11th Cir. 2003).

But the delayed disclosure of Brady/Giglio material compels reversal only when the defendant demonstrates prejudice. United States v. Beale, 921 F.2d 1412, 1426 (11th Cir. 1991). Specifically in the context of the government's failure to disclose impeachment evidence, a defendant is prejudiced where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

Carson does not contest that the government disclosed the plea agreements of the codefendants. Carson's entire Brady/Giglio argument is premised on the idea that the government's statements in his sentencing memorandum—that the government agreed it would not argue the cooperating codefendants were responsible for higher quantities of drugs at the codefendants' sentencings—

42

demonstrate undisclosed "side agreements" favorable to the defense.

A threshold question is whether this is favorable evidence the government failed to disclose. As the government argues, the plea agreements contained, and the government disclosed, the agreed-upon amounts of drugs attributable to each codefendant for sentencing purposes. The government says, and it seems inherently logical, that the agreed-to attribution amounts and the "undisclosed" side agreements that the government would not introduce additional drug quantities at sentencing are the same agreements.

Moreover, at trial Carson had the opportunity and indeed did vigorously cross-examine the codefendants about the plea agreements. Defense counsel questioned Carlos Riggs about the plea agreement and the fact that he admitted to agents that he was supplied with "a thousand pills at a time" to sell on McDonald Street. Through Special Agent Gerhardt's testimony in the government's case-in-chief, defense counsel knew (and the jury heard) that the 17 codefendants agreeing to guilty pleas had actually admitted the conspiracy involved the sale of over 60,000 Oxycontin pills. Defense counsel asked several of the codefendants whether they were attributed this greater amount or a smaller amount. For instance, in cross-examining Cameron White, defense counsel asked:

> [Defense Counsel:] And you and the Government negotiated an amount of drugs to be attributed to you, correct?
> [Cameron White:] Yes.
> [Defense Counsel:] Now, did the Government attribute to you 60,000

pills?
[White:]  No.
[Defense Counsel:]  They attributed to you how many pills, do you remember?
[White:]  I think—
[Defense Counsel:]  Just a minute.  Let me just . . . at least 20, but less than 50?
[White:]  Yes.
[Defense Counsel:]  Plus 100 grams of heroin, but less than 400 grams of heroin?
[White:]  Yes.

Similarly, defense counsel questioned Gavin Walker about his plea agreement and the applicability of the sentencing guidelines, and noted that his sentence would be "determined in large part by the amount of drugs attributed to you."  Defense counsel then confirmed that in his plea agreement with the government: (1) Walker did not agree to an attribution amount of 60,000 Oxycontin pills; and (2) Walker agreed to an attribution amount of 20,000 to 50,000 pills and 100 to 400 grams of heroin.

In sum, there is no favorable evidence that the government suppressed. Carson knew the attribution amounts agreed to by the government and his codefendants, and Carson knew that these amounts were less than that thought to have been attributable to the entire conspiracy.  Implicit in those agreed-to attribution amounts was that the government would only seek to show the codefendants were responsible for those amounts.  And in any event, Carson cannot show prejudice; this information, even if it was not disclosed, would not

have altered the proceedings.  Accordingly, Carson's claim fails.

## VII.  JURY CHARGE AND INDICTMENT

### A.    Standard of Review

We review a district court's jury instructions de novo "to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party."  United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009) (per curiam).  We will not reverse a defendant's conviction based on a challenge to a jury charge unless the Court is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  Gibson, 708 F.3d at 1275 (internal quotation marks omitted).

### B.    Discussion

Carson's sixth and seventh challenges are claims that the jury instructions constructively amended the superseding indictment in violation of the Fifth Amendment, permitting the jury to convict Carson for a conspiracy not charged by the indictment.

"It is well settled that a defendant enjoys a Fifth Amendment right to be tried on felony charges returned by a grand jury indictment and that only the grand jury may broaden the charges in the indictment once it has been returned."  United States v. Sanders, 668 F.3d 1298, 1309 (11th Cir. 2012) (per curiam).  A district court may not broaden the charges by constructive amendment.  Id.  "In evaluating

45

whether the indictment was constructively amended, we review the district court's jury instructions . . . in context to determine whether an expansion of the indictment occurred either literally or in effect." United States v. Seher, 562 F.3d 1344, 1363 (11th Cir. 2009) (internal quotation marks omitted). "A jury instruction amends an indictment when it broadens the possible bases for conviction beyond what is contained in the indictment." Id. (internal quotation marks and alterations omitted).

Carson argues two jury charges constructively amended the superseding indictment: (1) the conspiracy charge permitted the jury to convict Carson of a conspiracy to distribute any one of the controlled substances listed in the indictment, while the indictment charged Carson with a conspiracy to distribute all four controlled substances; and (2) the conspiracy charge allowed the jury to convict Carson for a "lesser-included offense" of conspiring to possess with the intent to distribute less than 100 grams of heroin, while the indictment charged Carson with a conspiracy to possess with the intent to distribute more than 100 grams of heroin.

The government responds that: (1) "the law is well established that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive," see United States v.

46

<u>Simpson</u>, 228 F.3d 1294, 1300 (11th Cir. 2009); and (2) the inclusion of a charge

on the amount of heroin involved in the conspiracy mattered only for purposes of

sentencing and did not constructively amend the indictment.

We next review the relevant jury instructions.  Specifically over the

defendant's objection, the district court instructed the jury that:

> <u>as to Count One</u>, you will note that the Defendant is not charged with committing a substantive offense; rather, he is charged with <u>conspiring</u> to commit the offense.
>
> It's a separate Federal crime for anyone to conspire to knowingly possess with intent to distribute oxycodone, heroin, cocaine hydrochloride or marijuana.
>
> While the Indictment is worded in the conjunctive, the law permits the government to prove the conspiracy charged in the disjunctive.  In other words, in order for a defendant to be found guilty, it will be sufficient if the government proves beyond a reasonable doubt that the defendant conspired to possess <u>one</u> of the controlled substances mentioned in Count 1, even if they were not involved in the other conspiracy, as long as all 12 of you agree as to which conspiracy the defendant was involved in.  So, for example, if all 12 of you find beyond a reasonable doubt that the defendant was involved in a conspiracy to distribute and possess with the intent to distribute oxycontin, that would be sufficient to convict the defendant of Count One, even if you find the defendant was not also involved in a conspiracy to distribute and possess with the intent to distribute heroin, cocaine hydrochloride or marijuana.
> . . . .
> The Defendant can be found guilty only if all the following facts are proved beyond a reasonable doubt:
> (1)    two or more people in some way agreed to try to accomplish a shared and unlawful plan to possess heroin, or oxycodone, or cocaine hydrochloride, or marijuana, as described in Count One;
> (2)    the Defendant . . . knew the unlawful purpose of the plan and willfully joined in it; and
> (3)    the object of the unlawful plan was to possess with the

47

intent to distribute oxycodone, or cocaine hydrochloride, or marijuana, or more than one hundred grams of heroin.

The district court also included, with the defendant's approval, a multiple conspiracies charge in line with Eleventh Circuit Pattern Jury Instruction 13.3:

> Proof of several separate conspiracies isn't proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies proved is the single overall conspiracy.
> You must decide whether the single overall conspiracy charged existed between two or more conspirators. If not, then you find the Defendants [sic] not guilty of that charge.
> But if you decide that a single overall conspiracy did exist, then you must decide who the conspirators were. And if you decide that a particular Defendant was a member of some other conspiracy—not the one charged—then you must find that Defendant not guilty.
> So to find a Defendant guilty, you must all agree that the Defendant was a member of the conspiracy charged—not a member of some other separate conspiracy.

As to the verdict form, the district court also reviewed that form with the jury, instructing the jury that they may need to determine what drugs were involved in the conspiracy, and in the case of heroin, how much: "In other words, you will need to decide if you find that this defendant is guilty of conspiring to possess with the intent to distribute or distribute heroin weighing 100 grams or more or weighing less than 100 grams." The district court then stated:

> The defendant is charged with possessing and intending to distribute at least 100 grams of heroin. But you may find the defendant guilty of the crime even if the amount of the controlled substance for which he should be held responsible is less than 100 grams. So if you find the defendant guilty, you must also unanimously agree on the weight of heroin the defendant possessed and specify the amount on the verdict form.

48

With those instructions in mind, we next consider the relevant statutes.

In Count 1 of the superseding indictment, Carson was charged with conspiring to knowingly, intentionally, and unlawfully possess with the intent to distribute and distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); a mixture and substance containing a detectable amount of cocaine hydrochloride, in violation of § 841(a)(1) and (b)(1)(C); an amount of oxycodone (Oxycontin), in violation of § 841(a)(1) and (b)(1)(C); and a mixture and substance containing a detectable amount of marijuana, in violation of § 841(a)(1) and (b)(1)(D), all in violation of 21 U.S.C. § 846.

Section 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 846 provides that "any person who attempts or conspires to commit any offense defined in this subchapter [including § 841(a)] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. Together, these statutes provide that a person may violate § 846 by conspiring to violate § 841(a)(1). For purposes of a conviction under § 841(a)(1) and by extension § 846, the specific amount and type of drugs involved

49

do not matter, and "the government's failure to prove the amount or type charged in the indictment does not merit reversal." United States v. Baker, 432 F.3d 1189, 1233 (11th Cir. 2005).

The amount and quantity of drugs only matter for purposes of § 841(b). Section 841(b) "provides enhanced maximum sentences for persons convicted of violating §§ 841(a) or 846, depending on the quantity and type of drug involved." Sanders, 668 F.3d at 1309 (citing 21 U.S.C. § 841(b)). Further, the enhanced penalties found in § 841(b) "cannot apply unless the jury determines the drug type and quantity involved in the overall drug conspiracy offense." Id.; see also Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362–63 (2000).

We consider first Carson's argument that the jury instructions constructively amended the indictment by charging the conspiracy as one to possess with the intent to distribute four controlled substances disjunctively, while the indictment charged the conspiracy as one to possess with the intent to distribute those same substances conjunctively.

As we noted above, neither the type of drug nor the quantity of that drug is an element of the offense of conspiracy to violate § 841(a)(1). Count 1 of the superseding indictment charged a generic violation of §§ 841(a)(1) and 846. "We recognize that [the] count adds sentencing language to give Apprendi notice that the government also charged that the overall conspiracy [involved heroin in an

50

amount of 100 grams or more, cocaine hydrochloride, oxycodone, or marijuana]. This language, however, is not required for conviction under § 841(a) but is required to set the statutory maximum sentence under § 841(b)." Sanders, 668 F.3d at 1311. Thus, the fact that the jury instructions changed the "and" to "or" in the list of controlled substances did not change the elements of the offense and did not constructively amend Carson's indictment. A conspiracy to possess with the intent to distribute any of the four controlled substances listed in the indictment could support a conviction under §§ 841(a)(1) and 846. It is also well-settled that the government may charge in the conjunctive and prove in the disjunctive. See Simpson, 228 F.3d at 1300.

Because the offense for which Carson was convicted was clearly encompassed by the indictment against the defendant, Carson is not being punished for actions that are beyond the reach of the charging document. The jury instructions that referred to the four drugs in the disjunctive did not constructively amend the defendant's indictment. See, e.g., United States v. Crawford, 449 F.3d 860, 861 (8th Cir. 2006) ("[I]t is well settled that a conspiracy to distribute more than one controlled substance may be charged in the conjunctive . . . but submitted to the jury . . . in the disjunctive."); United States v. Muelbl, 739 F.2d 1175, 1178–84 (7th Cir. 1984) (concluding that defendant's indictment was not constructively amended by jury instruction permitting the jury to find the defendant guilty of

51

conspiring to distribute marijuana, cocaine, or methaqualone even though indictment charged the defendant with conspiring to distribute marijuana, cocaine, and methaqualone).

Similarly, the amount of heroin involved in the offense is not an element of the offense; thus, that the jury instructions permitted the jury to find Carson guilty of Count 1 even if the conspiracy involved less than 100 grams of heroin—despite being charged with a conspiracy to distribute 100 grams or more of heroin—did not constructively amend the indictment.  Moreover, the district court reiterated that the jury had to find the quantity of heroin involved only after determining whether Carson had committed the charged offense beyond a reasonable doubt.

In his reply brief on appeal, Carson also argues that part of the instruction about the verdict form was misleading, in that it does not mention conspiracy and states the defendant "is charged with possessing and intending to distribute at least" 100 grams of heroin.  Even though "conspiracy" should have been used in this one sentence, the district court later stated: "You don't answer those questions [concerning the amount of heroin] if you don't find that the defendant conspired to possess with the intent to distribute heroin."  Also the charge overall clearly described Count 1 as a conspiracy charge, and the special verdict form itself states:

> 1.  We, the Jury, find the Defendant, Corderell DeWayne Carson, GUILTY/NOT GUILTY, as charged in Count One of the indictment.

[Note: If you find the Defendant not guilty as charged in Count One, you need not consider paragraph 2 below.  In that case, go straight to paragraph 3]

2.   We, the Jury, having found the Defendant guilty of the offense charged in Count One, further find <u>with respect to this charge that he conspired to possess with the intent to distribute or distribute</u> the following (place an X in the appropriate box):

Oxycodone (Oxycontin)                           ☐

Heroin
      (i) Weighing 100 grams or more        ☐
      (ii) Weighing less than 100 grams       ☐

After considering the district court's instructions in context and in light of the jury's special verdict, we conclude that the jury was not misled into convicting Carson of a crime for which he was not indicted.  Because Carson could not have been convicted of an offense for which he was not indicted, the district court's jury charges did not constructively amend the indictment.

## VIII.  CONCLUSION

Accordingly, upon review of the record and briefs and with the benefit of oral argument, we affirm.

**AFFIRMED.**